**IN THE UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

LARRY KLAYMAN
7050 W. Palmetto Park Rd
Boca Raton, FL, 33433

        Plaintiff,

v.

MATTHEW KAISER
c/o 1099 14th St NW
8th Floor West
Washington, DC, 20005

and


JULIA PORTER
515 5th St NW
Washington, DC 20001

and

HAMILTON FOX, III,
515 5th St NW
Washington, DC 20001

and

LAWRENCE K. BLOOM
515 5th St NW
Washington, DC 20001

and

JOHN DOES 1 TO 5
515 5th Street NW
Washington, D.C. 20001


        Defendants.

**COMPLAINT**

## COMPLAINT

Plaintiff LARRY KLAYMAN ("Plaintiff or Mr. Klayman") hereby files this action against MATTHEW KAISER ("Kaiser"), JULIA PORTER ("Porter"), HAMILTON FOX, III ("Fox"), H. CLAY SMITH ("Smith"), and LAWRENCE BLOOM ("Bloom") (collectively "Defendants") as joint tortfeasors acting in concert for defamation per se, defamation, and defamation by implication.

## JURISDICTION AND VENUE

1.      This Court has diversity jurisdiction over this case pursuant to 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.

2.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(3) in that this is a district in which the defendants are subject to the court's personal jurisdiction with respect to this action as the acts and practices alleged herein occurred and caused damage in this district.

## THE PARTIES

3.      Plaintiff Larry Klayman is a citizen of Florida and resident of Palm Beach County. He is a public interest and private lawyer, an author, columnist and syndicated radio talk show host on Radio America, who depends on his credibility and reputation for honestly to earn a living and to present his message and further his mission to promote an honest government and legal system. See Exhibit 1; Klayman Sworn Affidavit with Exhibits A through C incorporated herein by reference.

4.      Defendant Kaiser is a citizen of District of Columbia and the chairperson of the District of Columbia Board on Professional Responsibility.

5.      Defendant Porter is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as Deputy Bar Disciplinary Counsel.

6.      Defendant Fox is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as the Bar Disciplinary Counsel.

7.      Defendant Smith is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as Assistant Bar Counsel.

8.      Defendant Bloom is a citizen of District of Columbia and employed by the District of Columbia Office of Disciplinary Counsel as Senior Staff Attorney.

## **BACKGROUND FACTS**

9.      Defendants, working together in concert, have published malicious, false, and defamatory statements of and concerning Mr. Klayman to Josh Gerstein ("Gerstein"), a writer for Politco, a "prominent" leftist publication that is widely known to be anti-conservative and pro-Democrat party in ideology.

10.      Defendants published these malicious, false, and defamatory statements of and concerning Mr. Klayman to Gerstein with the instruction, expectation, and direction to re-publish them in a Politico article, which Gerstein did, on or about September 16, 2020 (the "Gerstein Article")

11.      On information and belief, the entire Gerstein Article was written at the direction of Defendants, rendering Defendants liable for all of the false, malicious, and defamatory statements contained therein,  which were calculated to severely damage Plaintiff Klayman and are on-going.

12.      Defendants made these false, misleading, deceptive, and defamatory statements about Mr. Klayman with actual and constitutional malice,  and intentionally and maliciously

intended to severely harm not just Mr. Klayman's personal and professional reputations but also to severely harm his public interest advocacy as the founder of both Judicial Watch, Inc. and now Freedom Watch, Inc., both ethics organizations whose mission is to promote and protect ethics in government and the legal system as a whole.  Mr. Klayman, prior to forming both public interest groups, was a former prosecutor in the Antitrust Division of the U.S. Department of Justice, where he was on the trial team that broke up the AT&T monopoly during the Reagan administration. Mr. Klayman, after years in private practice, and after he left Judicial Watch in the fall of 2003, ran for the U.S. Senate in his home state of Florida. After the election he formed Freedom Watch, where he is the president and general counsel today. Mr. Klayman also practices privately with his law firm Klayman Law Group, P.A., which is a Florida professional corporation, and the acts and practices alleged herein were intended to intentionally and maliciously severely harm his private legal practice as well as his clients in this circuit, thus destroying Mr. Klayman's and his family's livelihood and well-being.  The acts of Defendants were also maliciously designed to harm Mr. Klayman's other endeavors. Plaintiff was at all material times a member of the District of Columbia Bar for forty (40) years and a member continuously in good standing of The Florida Bar for 43 years, his having been sworn in when he as an associate of the Miami law firm of Blackwell, Walker on December 7, 1977.

13.     Defendants are very partisan leftists and donate heavily and/or are sympathetic to and support Democrat politicians and government officials who Klayman has sued in his public interest capacity, as can be confirmed by political donation records of the Federal Election Commission among other indicia of their leftist ideology. They set out to severely harm and damag Plaintiff's legal practices and other endeavors as set forth above, as well to negatively influence on-going bar disciplinary proceedings and court cases in order to work prejudice

against Plaintiff Klayman and his mostly conservative activist clients such as Laura Loomer, Sheriff Joe Apaio, Chief Justice Roy Moore, Cliven Bundy, Dr. Jerome Corsi, Kara Robles, Demetrick Pennie and others, to name just a few.

14.     On information and belief, based on objective evidence and a pattern and practice of similar acts, the Defendants acted in concert with Michael Tigar and Anthony Fitch, both having sat on an District of Columbia Bar Ad Hoc Hearing Committee, and then manufactured false recommended findings that Plaintiff had acted unethically in representing a woman who claimed, now disproven, to have been sexually harassed by another host at Voice of America while herself an Iranian host on Voice of America's Persian News Network. Importantly, the subject Gerstein article references this case, but fails to disclose that both Tigar and Fitch are radical leftists and in Tigar's case incredibly even a proud and avowed communist (the ideological opposite of Plaintiff Klayman) who was fired by Supreme Court Justice William Brennan for his communist ties to Fidel Castro and his equally murderous brothers, as even reported by famed Washington Post investigative reporter and editor in his landmark treatise on the Supreme Court, titled "The Brethren."

15.     Of equal importance, as set forth below, Tigar, along with about fifteen (15) other leftist law professors filed a frivolous ethics complaint before the District of Columbia Bar Disciplinary Counsel against then Trump White House Counsel Kellyanne Conway, and then unethically publicized this complaint to the media to harm both Ms. Conway and President Trump, thus underscoring the use of  leftist media, such as Gerstein and Politico, to harm conservatives like Mr. Klayman. Thus, there is a history and thus a pattern and practice  of District of Columbia Bar officials unethically using leftist media vehicles such as Gerstein and Politico to further their partisan agenda and harm conservatives such as Mr. Klayman. They have

also done so again recently with regard to an article published by the National Law Journal on March 16, 20021 which will be the subject of other litigation in the near future.

16.    Mr. Klayman had asked Defendant Kaiser for an internal review of this unethical public use of a bar disciplinary proceeding to defame Mr. Klayman through Defendants false and defamatory publication, and asked him if he was a participant as well, and in a letter of October 29, 2020 from the District of Columbia Board on Professional Responsibility, he did not deny Mr. Klayman's allegations much less even address Mr. Klayman's allegations, while also refusing to conduct an internal review, but instead stated disingenuously that he would  only entertain a new request after the conclusion of the proceeding before the District of Columbia Court of Appeals. Defendant Kaiser thus effectively admitted his and  other officials of the District of Columbia Bar disciplinary apparatus's involvement in this unethical and defamatory conduct in collaboration and in concert with Defendants to maliciously defame Mr. Klayman.

17.    Specifically, the September 16, 2020, Politico article written by Gerstein directly quoted malicious, false and defamatory statements by Defendants, as he publishes falsely and misleadingly "D.C. Bar officials contend the famously litigious Klayman misrepresented facts, filed meritless pleadings and brought frivolous demands for recusal and an ethics complaint against a judge who rejected the hard-charging lawyer's bid to join the defense team at Bundy's request." In fact and truth, there has never been any finding by the District of Columbia Bar disciplinary apparatus, or for that matter any other state bar, that Mr. Klayman has been dishonest, among other false and misleading representations in this published statement

18.    Furthermore, Gerstein admits, in falsely and misleadingly publishing that Mr. Klayman will be removed from the practice of law, to the detriment of himself, his family and his clients: "The danger for Klayman at present is not so much the Bundy related complaint but

the series of ethics cases he faces taken together. Bar officials say the record is mounting that Klayman is unfit to practice law."

19.     This clearly shows that Defendants published false, malicious and defamatory statements to Gerstein with the expectation, instruction, and direction to republish them in Politico, as Defendants are quoted in these statements.

20.     Such a public statement by the Defendants was not only unethical in and of itself, concerning on-going disciplinary proceedings, which are not meant for public relations purposes to further political agendas and ideologies, particularly in this age of Donald Trump where anyone who supported his presidency and is a conservative such as Plaintiff  is considered an "enemy of the state," but instead was calculated to severely damage Mr. Klayman whatever the ultimate result of the disciplinary proceedings. They were the result of Defendants not being confident that on the merits they could remove Mr. Klayman from the practice of law.

21.     On information and belief, they therefore put up and collaborated with Gerstein and Politico, who are of the same ideological and partisan ilk, and despise if not loathe Mr. Klayman for his public interest advocacy in bringing lawsuits against the Clintons, Barack Obama, and Joe Biden in particular, to do their "dirty work" by defaming Plaintiff.

22.     This is the same group of Defendants which is currently entertaining ethics complaints against Kellyanne Conway for remarks she made on MSNBC and Attorney General William Barr, for his dropping charges against General Michael Flynn and for remarks he made on cable news. Not coincidentally, all former presidents of the District of Columbia Bar signed and filed this ethics complaint against AG Barr, as well as a former Senior Assistant Bar Disciplinary Counsel.[1] The District of Columbia Bar is singularly comprised of rabidly partisan

---

[1] https://www.politico.com/news/2020/07/22/bill-barr-bar-association-probe-377272;

"leadership" of the left and is pro-Democrat and vehemently anti-Trump and anti-conservative ,
as is nearly every other institution in the nation's capital these days.

23.    It is the same group of Defendants  that  engaged in selective prosecution and
turns the other cheek when ethics complaints are filed against leftist and pro-Democrat lawyers,
such as David Kendall of Williams & Connolly, who has represented and continues to represent
Bill and Hillary Clinton and who was alleged to have obstructed justice and suborned perjury for
Hillary Clinton over the destruction of 33,000 emails when she was Obama's Secretary of State.[2]

24.    The District of Columbia Bar, much like everything else in the rabidly highly
politicized  world of the nation's capital, which many call "the swamp," has become partisan and
severely compromised and corrupt, to put it most diplomatically.

25.    In this regard, the allegations of this Complaint are not isolated when it comes to
District of Columbia Bar disciplinary apparatus and officialdom smearing and harming lawyers
whose politics or ideology they do not like. The same thing occurred with regard to a father and
son law firm of J.P. and John Szymkowicz, after an outrageous and unconscionable contrived
and fraudulent bar disciplinary proceeding that lasted thirteen (13) years, drove them to the brink
of bankruptcy by causing them to lose clients, and caused extreme emotional distress, and where
Bar Disciplinary Counsel, as with Mr. Klayman, unjustly sought their removal from the practice
of law. And, to add insult to severe injury, when the Bar disciplinary apparatus and officialdom
did not succeed and the Szymkowiczs where totally exonerated, they characteristically  put up a
former Senior Assistant  Bar Disciplinary Counsel Michael Frisch, now a leftist professor at
Georgetown Law School to defame them in his public blog postings.  *See* Exhibit 2. Such is the

---

https://www.washingtonpost.com/politics/law-professors-file-misconduct-complaint-against-
kellyanne-conway/2017/02/23/442b02c8-f9e3-11e6-bf01-d47f8cf9b643_story.html.
[2] https://lawflog.com/?p=1389

vindictive and malicious conduct of District of Columba Bar disciplinary apparatus and officialdom, as set forth above with Mr. Klayman as well.  Not coincidentally, J.P. Szymkowicz is the only Republican official in the district's government. And, not coincidentally, Mr. Frisch is one of the signatories, along with four (4) former presidents of the District of Columbia Bar, in the ethics complaint recently filed against AG Barr, which was then publicized by them, as has unethically occurred with Mr. Klayman and Trump White House Counsel Kellyanne Conway, and others.

26.     Of particular enmity among Defendants is Mr. Klayman advocacy in attempting to bring Bill and Hillary Clinton to justice, as Plaintiff has deemed them to "Bonnie and Clyde of American politics." And it is no surprise that even Defendant Kaiser, among others at the highest level of the District of Columbia  disciplinary apparatus and officialdom, has made substantial political contributions to the Clintons (as well as President Obama and Hillary Clinton) while at the same time writing columns for "Above the Law," a leftist legal publication trashing President Donald Trump and attesting to the "honesty" of Hillary Clinton.[3]

27.      It thus comes as no surprise that a recent Board report, written by and/or on behalf of Defendant Kaiser effectively hinges in part on Mr. Klayman having sued Mrs. Clinton in the past in his public interest capacity, while wholly irrelevant in the context of this case.

28.     Defendants malicious, false and defamatory statements, republished in this district and throughout the world through the Gerstein and Politico article thus is intended, with actual and constitutional malice, to portray a picture to the reader that Mr. Klayman has been deemed unfit to practice law and will soon and inevitably be removed from the practice of law, that is disbarment is imminent.

---

[3] https://abovethelaw.com/2016/08/hillary-clinton-truthfulness-and-bias-in-white-collar-cases/
https://abovethelaw.com/2016/07/trump-and-tyranny/

29.     The title to the column by the Gerstein, written in concert with and at the direction of Defendants, sets the defamatory theme. It publishes: "A Conservative Gadfly Faces the Music." It then ratches up the defamation as follows in the subparagraph by publishing " Larry Klayman pioneered slash-and-burn legal tactics that have become the feature of American politics. Now, he faces the prospect of his own legal demise."

30.     Not to be content with and to drive into the reader this lead in to the defamatory article, Gerstein, in concert with and at the direction of Defendants, then published: "While many on the Washington scene have been waiting for decades for Larry Klayman to get his comeuppance in court, three different ethics cases he is now embroiled in raise questions about how to police a legal system that generally imposes few consequences for filing marginal lawsuits and complaints."   This defamatory publication states that Mr. Klayman files (only) marginal cases and obviously given his many successes this is false and misleading. Exhibit 1.

31.     Then, Gerstein, in concert with and at the direction of Defendants, falsely publish that Mr. Klayman has predicted his own demise by writing "To hear Mr. Klayman conservative gadfly (who Defendants despise) and attorney Larry Klayman tell it, the end of this legal career haranguing the Washington political establishment could be nigh." To the contrary, Plaintiff never has said any such thing and in fact Defendants know full well that Mr. Klayman is a fighter and will never roll over to the left and its sycophants of the District of Columbia Bar disciplinary apparatus and officialdom..

32.     Then, Gerstein, in concert with and at the direction of Defendants, while unmasking their own political biases and inclinations, published: "During the 1990s, as he headed Judicial Watch, Klayman became reviled by many in the Clinton administration for forcing aides into bizarre, almost postmodern depositions that often led the witnesses to incur

tens of thousands of dollars in legal bills. His antics eventually inspired the writers of "The West Wing" to create a toxic, scandal-chasing character, Harry Klaypool of Freedom Watch. Klayman was thrilled and – after an rancorous breakup with other leaders of Freedom Watch – adopted the fictional name from the TV show as the name of his new organization."

33.     This published statement is defamatory in ways which include but are not limited to first stating that Mr. Klayman forced Clinton aids into deposition, when in truth and fact they were sanctioned and approved of by the Honorable Royce C. Lamberth of the U.S. District Court for the District of Columbia, after Mr. Klayman's deposition notices were challenged. Second, the published statement brands Mr. Klayman's public interest advocacy concerning seeking legal redress the myriad of Clinton scandals, which continue to this day, as "antics," are hardly truthful given Mr. Klayman's successes. Third, the published statement, among others, represents that Mr. Klayman was thrilled by the Harry Klaypool character on "West Wing," which was created by Aaron Sorkin and other Clinton loyalists such as Lawrence O'Donnell and former Clinton White House press secretary Dee Dee Myers, when in truth and fact Defendants do not know this one way or the other.

34.     Indeed, while admittedly communicating, plotting and colluding and acting in concert with Defendants, Gerstein and Politico incredibly  never even sought a comment from Mr. Klayman before widely publishing this defamatory article in this circuit, nationally and internationally. These are just a few of the false and misleading defamatory statements in this published representation and article.

35.     Gerstein, in concert with and at the direction of Defendants, also writes "While many on the Washington scene having been waiting for decades for Klayman to get his comeuppance in court, three ethics cases he is now embroiled in raise questions about how to

police a legal system that generally imposes few consequences for filing marginal and lawsuits and complaints." The defamatory nature of this malicious statement speaks for itself, particularly given Mr. Klayman's many successes in his public interest and private practice legal advocacy.

36.     As further evidence of the fact that Gerstein and Politico were working in concert with and at the direction of Defendants, the article tries to paint Defendant Porter favorably: " But she (Julia Porter, Deputy Bar Disciplinary Counsel) reserved her harshest criticism for Klayman's practice of targeting judges and bar officials with suits, recusal motions and ethics complaints when he finds himself on the losing side of a legal decision. … They are consistent with Mr. Klayman's pattern of retaliation and intimidation of people who either act against him, Porter said. … She should know. He's filed at least three federal lawsuits against Porter and her office over their actions toward him. Two of the suits have been dismissed, although appeals are pending."

37.     Not mentioned was that Ms. Porter was ordered to be under an internal review ethics investigation by the District of Columbia Bar by a prior Chairman of the Board of Professional Responsibility, Robert Bernius, over her pattern and practice of lying and engaging in other unethical and illegal acts with regard to the Szymkowiczs' case, which lasted thirteen years and resulted in their "acquittal," but not after they were taken to the brink of bankruptcy and severe emotional breakdown, losing clients and business in the long interim. To make matters worse, she then put up her former colleague Michael Frisch, a then a leftist law professor at Georgetown, to publically defame Mr. Klayman. Exhibit 2.

38.     Then while Defendant Porter and her Office of Disciplinary Counsel presented no witnesses in the principal disciplinary matter involving the Bundy matter mentioned in the defamatory article, Gerstein, in concert with and at the direction of Defendants, then mock and

disparage Mr. Klayman's material witnesses, even mocking and belittling their race when it suits the theme of their defamatory article. Ironic indeed, as the left has maintained its mantra that conservatives are inherently racist.

39.     For instance, Gerstein, in concert with and at the direction of Defendants, publishes: "For Klayman, that meant showcasing witnesses who would testify to his character. The result was a cavalcade of right-wing personalities, including two former presidential candidates: ex-Rep. Bob Barr (R-Ga.) and former Ambassador Alan Keyes. … Also singing Klayman's praises were conservative talk show host Armstrong Williams, author and conspiracy theorist Jerome Corsi and no fewer than four members of the Bundy family two of whom appeared to be testifying while sitting in farm equipment."

40.     This published statements obviously show not just Defendants' leftist mocking of conservatives, and Ambassador Alan Keyes is a black conservative, but also of the Bundy family, who Defendants characterize as hicks, the equivalent of the Beverly  Hillbillies, and it is false that they all testified while sitting in farm equipment.

41.     Then to continue their condescension, contributing to this defamatory hit piece on Mr. Klayman, Gerstein, in concert with and at the direction of Defendants publishes: "A key element of Klayman's defense before the ethics panel was to downplay his Republican ties and emphasize instead that he has sued presidents and other political figures from both major political parties. The second and slightly less explicit thrust of his defense was that he has many friends and clients who are African American."  The latter reference in particular, was intended to suggest that Mr. Klayman exploited his African American friends and clients, heightening and compounding the "cleverly crafted" mocking, condescending, disparaging and defamatory content and tone of the defamatory article. It is also the height of hypocrisy that Defendants

generally view and brand conservatives as racists, a constant theme these days in all sectors of the left wing media, some even claiming that whites are born with a biological racist gene.

42.     As a further example of Gerstein's, in concert with and at the direction of Defendants, mocking and condescension, they published: "I've told people that if I had won, you would have been my choice for attorney general," Keyes told Klayman during the hearing, beaming in on Zoom from the anchor desk of a television studio…."

43.     Then with regard to conservative black television and radio personality and pundit Armstrong Williams, Gerstein, in concert with and at the direction of Defendants, continuing the mocking, condescending, belittling, devaluing and disparaging and defamatory  theme about Mr. Klayman's African-American witnesses much less colleagues and friends, they published: "You and I have never had an issue when it comes to character, integrity, and your honoring your word," said Williams, who spoke sitting in front of a tea-shirt from Ben Carson's (also African American) 2016 presidential campaign…. That I can absolutely say is true, yest. You always honor your word – even as a lawyer, yes. … Steadman Graham, you actually are partners with him, that was Oprah's boyfriend for a while, right?, Klayman asked Williams. … Yeah .. I don't know why its relevant, but it's true, Williams said, prompting a visible eye roll and chuckle from the lawyer overseeing the hearing, Buffy Mims."

44.      In fact and truth there was not such eye roll from this African American hearing committee chair, thus furthering the defamatory theme of Defendants' article and putting down Mr. Klayman's African American witnesses, colleagues and friends such as Armstrong Williams, which Defendants conspicuously did not do to this extent with Mr. Klayman's white witnesses. Indeed, it is ironic, but typical, that these leftist Defendants chose to mock Mr. Klayman's black witnesses, colleagues and friends, as there is no limit when it comes to their

despicable defamation and hatred of conservatives, black or white or whatever shade or color race, ethnicity  or religion, in Mr. Klayman's case a Jew who believes in Jesus and has become and is  a Jewish Christian.

45.     Then, Gerstein, in concert with and at the direction of Defendants, work on Mr. Klayman's African American policeman client and friend Demetrick Pennie, who is not coincidentally running for Congress is Texas. They publish: "Klayman also called Dallas police sergeant and GOP congressional candidate Tre Pennie as a character witness. He represented Pennie in an unusual suit that sought to tie shootings of Dallas police officers to rhetoric from Black Lives Matter, President Barack Obama, Sen. Hillary Clinton and others. … How do we refer to each other? Klayman asked. As brothers, replied Pennie."

46.     Gerstein, in concert with and at the direction of Defendants, misleadingly distorted their characterization of the Pennie lawsuit, whose primary target defendant was Louis Farrakhan of the Nation of Islam, who just days before the Dallas police massacre, in which Pennie was assaulted as well,  called for his disciples, such as Micah Johnson, who obediently carried out the massacre, to kill white cops in particular. By calling the suit "unusual" this contributed to the defamatory theme of Gerstein article, which was intended maliciously to defame any case or any endeavor Mr. Klayman had engaged into over his forty three plus successful legal career. It was also intended as a condescending, mocking, and belittling put down, if not devaluation, of a brave African American police officer who stuck his neck out to obtain justice, and for so doing had his life and those of his loved ones threatened with death by those radical leftists who Defendants support and are sympathetic with.

47.     Then Gerstein,  in concert with and at the direction of Defendants, continue this defamatory smear and attack on Plaintiff, by publishing: "At another point, Klayman called the

15

panel's attention to a recent success: a ruling he won in Manhattan federal court earlier this year allowing former U.S. Senate candidate Roy Moore (R-Ala.) to proceed to discovery in a defamation suit against comedian and filmmaker Sasha Baron Cohen. .. An Obama-appointed, African American judge allowed the case to go forward, a very fair man, Andrew Carter. A very fine judge, Klayman told the committee. … Klayman never directly explained the relevance of the judge's race or Pennie's, but two of the three members of the bar committee hearing the ethics case are African American and the on-line biography of the panel's chairwoman, Mims, prominently describes her as the co-chair of the Diversity & Inclusion Committee at her law firm."

48.     Again, Defendants, acting in concert with Gerstein and Politico, use race in a despicable condescending   way to mock, belittle, and devalue, Mr. Klayman's material witnesses, and the Gerstein article conspicuously omits and fails to point out that Defendants failed to present even one, repeat even one, witness in this entire disciplinary proceeding.

49.      It is therefore Defendants who are using race to compound the defamatory nature of the subject article, making fun of African Americans when it suits their malicious purposes to collaborate with District of Columbia Bar disciplinary apparatus and officialdom   to harm Mr. Klayman over his conservative advocacy and credentials, and who has taken on those, such as the Clintons, Obama and Biden, who they support.

50.     Not to be deterred from the continuing defamatory attack, Defendants, acting in concert with Gerstein and Politico, then mocked and belittled accolades by Mr. Klayman's clients and other others who admire and have appreciated his public interest and private legal advocacy. Indeed, these references were admitted into evidence and it was not "unusual" that an advocate like Mr. Klayman would use them to show his ethical, moral and honest character. But

not to be undone, Gerstein, in concert with and at the direction of Defendants published: "Klayman's effort to demonstrate his exemplary character took other unusual turns, as he read from jacket blurbs of his own books and from articles written by his supporters. As always there was no understatement." *See* Exhibit 1 – Klayman Sworn Affidavit

51.     For Defendants, everything that Mr. Klayman has done and does is either "unusual," unethical, frivolous, marginal, lacking merit, harassing or has some other nefarious illegitimate purpose – you name it so long as it defames Plaintiff. These venomous and malicious attacks on Mr. Klayman, his legal practice and his character comports with their leftist agenda, which is to defame and  harm if not destroy conservatives, libertarians and people of faith, such as conservative Jews and African Americans in particular.

52.     In this regard, Defendants, when it suited their false and misleading hit defamatory hit piece,  even misleadingly belittled another leftist, but unlike them  a distinguished and an ethical one, Dean Erwin Chemerinsky, of the University of California School of Law, known as "Boalt Hall," one of the top law schools academically in the nation, published in the subject article: "A leading liberal constitutional law expert, University of California at Berkeley law dean Erwin Chemerinsky also testified on Klayman's behalf earlier in the ethics case stemming from the Bundy prosecution. The esteemed law professor concluded there was no ethical violation by Klayman in the Bundy case. Klayman told the panel." Then Defendants added gratuitously, to undercut Dean Chemerinsky's sworn testimony as a legal expert on behalf of Mr. Klayman, "(Chemerinsky confirmed to POLITICO Tuesday that he testified for Klayman, but the professor said he could not recall the details.).

53.     Not only is this representation about Dean Chemerinsky not recalling the details misleading and false, but there was no objective or even subjective reason to make this statement

since the sworn hearing testimony of Dean Chemerinsky was entered into evidence and made a hearing exhibit, referred to by Mr. Klayman at the hearing which Defendants watched by Zoom, and was publically available to the Defendants, to which Mr. Klayman had referred to at the hearing. This cheap shot, false as it was, attests to the actual and constitutional malice set forth in the article which is the subject of this suit. Defendants, acting in concert with Gerstein and Politico, themselves feel free to lie and mislead whenever it suits their malicious ends.

54.     Then another misleading and false statement is made when Gerstein,  again in concert with and at the direction of Defendants, publishes: "While many view Klayman as an early pioneer of a political weapon he seemed to lament that phenomenon during this week's session, ruling what he called 'the age of the politics of personal destruction' in an ironic echo of a famous Bill Clinton line."  To the contrary, Mr. Klayman did not lament about his successful and storied legal and other careers; only the partisan and hateful attacks of the left to try to take him down, which he vigorously resists.

55.     And then as a final salvo, revealing their collaboration and complicity with Gerstein and Politico, of which they are comrades ideologically and in practice, Defendants brazenly reveal their joint tortfeasor status: "The danger for Klayman at present is not so much the Bundy-related complaint but the series of ethics cases he faces taken together. Bar ethics officials say the record is mounting that Klayman is unfit to practice."

56.     Then to top it all off, Gerstein, in concert with and at the direction of Defendants, maliciously and intentionally lied again by characterizing the reaction of committee panel members in the Bundy case, when they published: "Klayman also asked for leniency by saying he serves as a lawyer of last resort for many of his clients" and again made it appear that the hearing panel found Mr. Klayman's defense to be a joke.

57.     Gerstein, in concert with and at the direction of Defendants, wrote: "The other panel members (in addition to the chair Mims), former Federal Trade Commission deputy general counsel Christian White and prison rehabilitation advocate Robin Bell, occasionally broke out bemused smiles at some of Klayman's antics…"

58.     To the contrary, Plaintiff advocated that he acted ethically at all times and did not ask for even imply leniency, as he forthrightly told the panel members that discipline was not warranted in any of the politically motivated bar proceedings. Nor did the panel members treat Mr. Klayman's defense a joke. Indeed, during the initial hearing, which preceded this one, they could not find clear and convincing evidence that Mr. Klayman  committed any ethics violations. Thus, there logically was no need for Mr. Klayman to throw himself on the mercy of the panel and beg for leniency – a total fabrication by Defendants, in concert with Gerstein and Politico.

59.     Importantly, none of the Defendants, including Defendant Mathew Kaiser, the Chairman of the Board of Professional Responsibility who oversees and directs all of the other Defendants here,  when presented with the opportunity by Plaintiff Klayman to deny directing and acting in concert with Gerstein and Politico to commit the acts set forth herein, would do so, creating an admission that all indeed they did so act in concert with Gerstein and Politico with the malicious intent to defame and harm Plaintiff in his trade and professions and personally, as well as to negatively influence and create bias and prejudice against Plaintiff Klayman and his clients, unethically and illegally in on-going bar and court proceedings.

## First Cause of Action – Defamation

60.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

61.     Plaintiff has been severely harmed and damaged by these false and misleading statements of by Defendants because they subjected him to hatred, distrust, ridicule, contempt, and disgrace.

62.     These defamatory statements were published with actual and constitutional malice as they were known by Defendants be false and misleading, as Defendants have closely followed and is intimately familiar Plaintiff's legal career and other endeavors, particularly since Defendants loathe and oppose his conservative ideology.

63.     Alternatively, Defendants' false and misleading published statements were made with reckless disregard for the truth. The foundation facts for this actual and constitutional malice are set forth with specificity in previous paragraphs of this Complaint.

64.     Plaintiff has been damaged by these false and misleading statements because they severely injured Plaintiff Klayman in his profession and businesses, as well as severely injured and damaged him personally, financially and in terms of his good will and reputation.

**Second Cause of Action – Defamation Per Se**

65.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

66.     Defamation *per se* gives rise to the presumption that severe harm and damage has arisen by virtue of the malicious false and misleading statements.

67.     These defamatory statements were published with actual and constitutional malice as they were known by Defendants to be false and misleading , as they have closely followed and are intimately familiar Plaintiff's legal career and other endeavors, particularly since they loathe and opposes his conservative ideology.

68.     Alternatively, Defendants' false and misleading published statements were made with reckless disregard for the truth. The foundation facts for this actual and constitutional malice are set forth with specificity in previous paragraphs of this Complaint.

69.     These malicious false, misleading, and defamatory statements are defamatory *per se* and these false and misleading statements severely harmed and damaged Plaintiff Klayman in his trade and professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally, and has severely damaged Plaintiff's reputation, good will, and financial well-being and ability to earn a living for him and his family.

**Third Cause of Action - Defamation by Implication**

70.     Plaintiff re-alleges and incorporates by reference the allegations in the preceding paragraphs of the Complaint as if fully set forth herein.

71.     These defamatory statements were published with actual and constitutional malice as they were known by Defendants to be false and misleading, as they have closely followed and are intimately familiar Plaintiff's legal career and other endeavors, particularly since they loathe and opposes his conservative and pro-Trump ideology, and has sued the Clintons, Obama and Biden in his public interest and personal capacities.

72.     Alternatively, Defendants' false and misleading published statements were made with reckless disregard for the truth. The foundation facts for this actual and constitutional malice are set forth with specificity in previous paragraphs of this Complaint.

73.     Defendants have made statements which carry a strong defamatory implication as to Plaintiff.

74.     Defamation by implication stems not from what is literally stated, but from what is implied. *Nunes v. WP Co. LLC*, No. 20-cv-01403 (APM), 2020 U.S. Dist. LEXIS 242227, at *8 (D.D.C. Dec. 24, 2020). "To establish defamation by implication, the plaintiff must demonstrate (1) that "a defamatory inference can reasonably be drawn" and (2) that "the particular manner or language in which the true facts are conveyed" supplies "additional, affirmative evidence suggesting that the defendant *intends or endorses* the defamatory inference." *Id*.

75.     Defendants' statements all carry a defamatory inference, which can reasonably be drawn by the reader.

76.     Plaintiff has been severely harmed and damaged by these false and misleading published statements, taken as a whole as set forth in detail in the preceding paragraphs, because they subject him to hatred, distrust, ridicule, contempt, and disgrace.

77.     These malicious false, misleading, and defamatory statements are defamatory *by implication* and these false and misleading statements severely harmed and damaged Plaintiff Klayman in his trade and professions as a public interest and private advocate and litigator and as an author, columnist and radio and internet radio talk show and syndicated host, as well as personally,  and has damaged Plaintiff's reputation, good will, and financial well-being and ability to earn a living for him and his family, as well as negatively harmed him by prejudicing on-going disciplinary proceedings and court cases concerning him and his clients as set forth above.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against all Defendants, jointly and severally as joint tortfeasors who also acted in concert between themselves and with District of Columbia

Bar disciplinary apparatus and officialdom (and as yet unnamed subject to discovery "volunteer" hearing committee members communist Michael Tigar and his ultra- leftist colleague Anthony Fitch),   as follows:

a.      Awarding Plaintiff compensatory including actual, consequential, incidental  for malicious defamatory concerted conduct, jointly and severally, in an amount to be determined at trial and in excess of $55,000,000.00 for the damages caused to his personal, and professional reputations and good will and well-being  in his trades and professions, as well as past and prospective financial losses, personally and professionally.

b.      Awarding Plaintiff punitive damages.

c.      Awarding Plaintiff attorney fees and costs.

d.      Granting such other relief as the Court deems appropriate and necessary.

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL CLAIMS SO TRIABLE**.

Dated: March 19, 2021                                    Respectfully Submitted,


    */s/ Larry Klayman*
Larry Klayman, Esq.
Florida Bar. No. 246220
7050 W. Palmetto Park Rd
Boca Raton FL 33433
Telephone: 561-558-5336
Email: leklayman@gmail.com

*PLAINTIFF PRO SE*

# EXHIBIT 1

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA**

LARRY KLAYMAN, ESQ.


            Plaintiff

   v.

MATTHEW KAISER, et al

                                        Case Number:


            Defendants
_____


**SWORN AFFIDAVIT OF LARRY KLAYMAN**

I, Larry Klayman, being over eighteen years of age and duly competent to testify, hereby

swear and affirm as follows:

**A BRIEF HISTORY OF MY BACKGROUND**

1.      I have personal knowledge of the following facts and if called upon as a witness,

could testify competently thereto.

2.      I am a citizen of Florida and have, at all material times, done business in this judicial

circuit.

3.      In 1973, I graduated from Duke University where I majored in political science and

French literature. I excelled academically and graduated with honors.

1

4.      I then matriculated at Emory Law School where I excelled academically and graduated in 1977. While in law school, I worked as an intern at the U.S. International Trade Commission, the Georgia Attorney General and the U.S. Attorney for the Northern District of Georgia.

5.      I passed The Florida Bar the first time I took the exam.

6.      I passed all bar exams on my first attempt, including the District of Columbia Bar.

7.      I began my legal career in this circuit in Miami, Florida as an associate for Blackwell, Walker, Gray, Roberts, Flick & Hoehl ("Blackwell"), which was then the largest and most prestigious law firm in Florida. I was admitted into The Florida Bar having been sworn in on December 7, 1977. I have practiced law in this circuit continuously and extensively throughout my forty-two-year career and have active cases pending in this circuit and elsewhere in Florida, including during the period that I was a trial attorney for the U.S. Department of Justice's ("DOJ") Antitrust Division, from 1980 to 1982, where I was assigned litigation in this circuit. Attached as Exhibit A is a copy of my abbreviated biography.

8.      I conceived of and founded Judicial Watch, Inc. ("Judicial Watch") in 1994, a public interest group that's mission was to investigate and prosecute government corruption and abuse. I was the Chairman, General Counsel, and Corporate Treasurer of Judicial Watch until I voluntarily departed in 2003 to run as a candidate for the U.S. Senate in Florida in the Republican primary election.

9.      In 1998, during the time I ran Judicial Watch, I hired Thomas J. Fitton ("Fitton") as my contract assistant. I later appointed him president of the organization I founded.

10.      In September of 2003, I voluntarily departed from Judicial Watch to run for the U.S. Senate in Florida. At the time I left Judicial Watch, I learned that Fitton had never graduated from college, which he had told me he had when I initially hired him.

11.     I have enjoyed many successes in my career as a lawyer, many of which have been brought to the attention of the public by complimentary newspapers, magazines, editorials and journals.

12.     For example, I practiced law at Blackwell with my supervising partners Paul Larkin and Layton Mank and participating in winning product liability cases as defense counsel for Blackwell including cases involving Raleigh bicycles, pharmaceutical drugs manufactured by Burroughs-Wellcome, and allegedly misdiagnosed cancer victims, and other personal injury and medical malpractice cases. Additionally, I handled lawsuits in admiralty.

13.     I left Blackwell to join the DOJ as a trial lawyer, prosecutor and defense lawyer in late 1979. During my time at the DOJ, I had many victories in the courtroom as well as favorable settlements for the government, i.e., such as for the Consumer Affairs Section of the Antitrust Division over misbranded, adulterated food and drug products including fruit drinks and prophylactics for the Food & Drug Administration ("FDA") and successful seizures and criminal prosecutions of dangerous products on behalf of the Consumer Product Safety Commission ("CPSC") such as slant-sided refuse bins, flammable children's sleepwear, and intraocular lens implants for cataract patients.

14.     Importantly, I was also on the trial team that successfully broke up the AT&T monopoly – creating competition in the telecommunications industry. I left the DOJ in late 1981.

15.     Then, working as an international trade lawyer for Busby, Rehm & Leonard and after a few years having founded my own firm The Law Offices of Larry E. Klayman, later named Klayman & Associates, P.C., I won countervailing duty and antidumping duty cases concerning steel from South Africa, garden furniture from Italy, musical instrument pads from Italy, coffee filters from Brazil, key limes from Peru, fireworks from China and a host of other product imports. I represented both importers and exporters. (While at Busby, Rehm & Leonard, I also took some

3

months on hiatus and worked in the Competition Directorate (DG-4) of the Commission of the European Communities Section ("E.C.").

16.     Later, with my law firm, I won Section 337 unfair trade practice cases at the U.S. International Trade Commission ("USITC") concerning tennis rackets from Belgium, power tools from Taiwan, luggage from Taiwan, mass spectrometers from France, jam from Belgium, and machine tools from Brazil. I won a landmark case concerning recloseable plastic bags, which broke the patents of Minigrip and Dow Corning, Minigrip's licensee. That case victory opened up competition for zip lock bags, a multi-trillion dollar industry.

17.     There was also an USITC patent case, pursuant to Section 337, which I litigated and won involving motorcycle helmets and another antidumping and countervailing duty cases before the Commerce Department and USITC concerning fire protection products and scuba diving neoprene body suits.

18.     I also won a Section 302 case involving paper from Brazil.

19.     All of the Section 337 cases were judge-tried and I won every one of them.

20.     I won a jury trial against Makita over power tools, another jury trial against a domestic manufacture of removable swimming pools for my client Remove Pool Fence Co., and yet another jury trial for my client, Maccaferri, on a contract dispute. These are only some of the jury trials I won during my early career.

21.     Because of my work during the time I ran Judicial Watch, a court ruled that President William Clinton committed a crime during the Filegate litigation. I also triggered the famous Chinagate scandal in a Freedom of Information Act, 5 U.S.C. § 552 et seq., which gave rise to Judicial Watch ultimately being awarded almost a million dollars. I filed cases which ended Bill and Hillary Clinton's attempted illegal purchase at below market rates for their mortgage of their home at Chappaqua, New York and ended the illegal payment of legal fees to the Clintons by State Farm,

4

which was a form of bribery. I also participated in the famous *Gore v. Bush* litigation in Tallahassee, Florida that settled the 2000 presidential elections by the U.S Supreme Court. I also brought a case under the Foreign Agents Registration Act ("FARA") over the Cheney Energy Task Force that made its way to the U.S. Supreme Court.

22.     I brought a case for Jose Basulto of Brothers to the Rescue in a Florida court, which resulted in a $1.8 million judgment against the Republic of Cuba for shooting down Brothers to the Rescue planes, and I represented the Miami family of Elian Gonzales and other victims of Fidel Castro, such as journalists who were jailed by Castro for their political beliefs. In this regard, I not only filed criminal complaints for these victims against Fidel Castro in Belgium courts, but also lobbied and testified in both Italian and French in Italy and France, as I am fluent in both languages, before various European parliaments to increase economic sanctions on Cuba for abuse of human rights. I also lobbied the European Union in Brussels, Belgium for increased sanctions on Cuba.

23.     On December 16, 2013, Judge Richard J. Leon granted my request for a preliminary injunction in my case against the National Security Agency ("NSA") and the Obama administration, when Judge Leon found for the first time in history that the collection of metadata telephony records by the NSA was likely unconstitutional.

24.     Because of that ruling, Congress enacted the USA Freedom Act, which sought to end illegal and unconstitutional mass surveillance by government intelligence agencies and the Federal Bureau of Investigation ("FBI").

25.     I obtained a jury verdict in the U.S. District Court for the Southern District of Florida against my former public interest group Judicial Watch, which was then run by Fitton, for maliciously defaming me in the amount of $181,000, which included punitive damages.

26.     My client Sheriff Joe Arpaio and I were the first to challenge former President Obama's unconstitutional executive amnesty for over 5 million illegal aliens and were ultimately successful, along with 25 other attorneys general, in front of the U.S. Supreme Court.

27.     It was my efforts that prevented Dr. Jerome Corsi ("Dr. Corsi") from getting indicted, first because he told the truth and did not engage in witness tampering and threaten to kill a witness such as Randy Credico, as Defendant Stone did, and second because of my legal skill and acumen. Dr. Corsi is a material witness in the Russian Collusion investigation by Special Counsel Robert Mueller ("Mueller") and is listed as a material witness as Person 1 in Defendant Stone's Mueller indictment.

28.     I have had many other successes in addition to the above-listed victories.

29.     I myself authored a book titled "Whores: Why and How I Came to Fight the Establishment" published in 2009. In it, I wrote about my unfortunate experience with Defendant Stone. *See* Exhibit B. I authored this book myself without a ghostwriter and I came runner-up at an International Book Fair. It also still has a review on www.Barnesandnoble.com of 4.5 stars out of the maximum 5 stars.

30.     Upon its publication, Jack Cashill, the author of "Ron Brown's Body" had this to say about me: "That *Time* magazine has yet to name Larry Klayman 'Man of the Year' is a failure of *Time*, not Klayman's. The work he and Judicial Watch did on the Brown case is stunning." *See* Exhibit B.

31.     Joseph Farah, the founder of WorldNetDaily.com, had this to say about me: "Larry Klayman is my hero because he has integrity – enough to prevent him from blind loyalty to party or ideology . . . That's because he is fearless and relentless in the pursuit of justice . . . There were other men like Larry early in American history. Their names were Washington, Jefferson, Madison and Henry. *See* Exhibit B.

6

32.     Louis Jacobson of the National Journal said this of me: " . . . through his challenge of secrecy rules, Larry Klayman has become a force in Washington. *See* <u>Exhibit B</u>.

33.     Bill Moyers, of "Now" PBS, said this: ". . . his idea of fun is trying to kick down a door some public official has marked secret . . . Larry Klayman is himself a conservative, but there's nothing partisan bout his indignation."

34.     Frank Rich, famed columnist for "The New York Times" said this: "Larry . . . I appreciate your own maverick – if we can still use that word! – thinking and stands." *See also* Advance Praise for "It Takes a Revolution: Forget the Scandal Industry." <u>Exhibit B</u>.

35.     These are just a few of the accolades I have received over the years from conservatives and liberals alike, who appreciate and admire my work. *See* my biography attached as Exhibit A and incorporated herein by reference; *see also* <u>Exhibit C,</u> "Larry Klayman, the One Man Tea Party" which attributes the genesis of the Tea Party to me.

36.     I am now the founder, Chairman and General Counsel of Freedom Watch, Inc., which has the mission of investigating and prosecuting government corruption and abuse through legal advocacy. I also am in private practice with The Klayman Law Group, P.A. Judicial Watch, under Fitton, who is not a lawyer, changed its mission after I left to run for the U.S. Senate. It now primarily focuses on Freedom of Information Act requests, seeking mostly documents, but generally does not bring hard-hitting lawsuits to mete out justice. Thus, I am unique as a public interest advocate. I am a columnist for World Net Daily and have had about 500+ columns published over the last 10 years. I am also a columnist for Newsmax through a blog titled "Klayman' Court" and in addition to my book "Whores: How and Why I Came to Fight the Establishment", I also published two other books: "Fatal Neglect" and "Essays of a Mad Man." I also have my own syndicated radio show with Radio America called "Special Prosecutor with Larry Klayman."

### **DAMAGES**

37.    As an attorney, I rely on my virtue and integrity, as my reputation and good will determines the amount of clients that come to me to earn a living for their legal matters in the public interest and privately.

38.    Any damage done to my reputation harms my ability to practice law as a lawyer, particularly in this circuit, which is my community. This also harms my work as an author, columnist and syndicated radio talk show host, all of which depend on reputation and good will.

39.    Defendants' statements in this instance have caused harm to my reputation, good will and well being in this circuit, throughout Florida, the United States, and globally, as I am also an international lawyer as previously set forth in this affidavit.

40.    Defendants acted with malice when they published all of the defamatory statements. They knew the statements were false or had a reckless disregard for their truth. They had reason to know his false and misleading statements were false.

41.    I was damaged financially, as well as to my reputation and good will, and emotionally, by the defamatory and other tortious acts of Defendants.

Affiant Sayeth Not

SWORN TO UNDER OATH THIS 19TH DAY OF MARCH OF 2021.

_____
Larry Klayman

# EXHIBIT A

# ABOUT LARRY KLAYMAN

Larry Klayman, founder of Judicial Watch and Freedom Watch, is known for his strong public interest advocacy in furtherance of ethics in government and individual freedoms and liberties. During his tenure at Judicial Watch, he obtained a court ruling that Bill Clinton committed a crime, the first lawyer ever to have done so against an American president. Larry became so famous for fighting corruption in the government and the legal profession that the NBC hit drama series "West Wing" created a character after him: Harry Klaypool of Freedom Watch. His character was played by actor John Diehl.

In 2004, Larry ran for the U.S. Senate as a Republican in Florida's primary. After the race ended, he founded Freedom Watch.

Larry graduated from Duke University with honors in political science and French literature. Later, he received a law degree from Emory University. During the administration of President Ronald Reagan, Larry was a Justice Department prosecutor and was on the trial team that succeeded in breaking up the telephone monopoly of AT&T, thereby creating competition in the telecommunications industry.

Between Duke and Emory, Larry worked for U.S. Senator Richard Schweiker (R-Pa.) during the Watergate era. He has also studied abroad and was a stagiaire for the Commission of the European Union in its Competition Directorate in Brussels, Belgium. During law school, Larry also worked for the U.S. International Trade Commission in Washington, D.C.

Larry speaks four languages—English, French, Italian, and Spanish—and is an international lawyer, among his many areas of legal expertise and practice.

The author of two books, *Fatal Neglect* and *Whores: Why and How I Came to Fight the Establishment,* Larry has a third book in the works dealing with the breakdown of our political and legal systems. His current book, *Whores,* is on now sale at WND.com, Amazon.com, BarnesandNoble.com, Borders.com, and all major stores and booksellers.

Larry is a frequent commentator on television and radio, as well as a weekly columnist, on Friday, for WND.com. He also writes a regular blog for Newsmax called "Klayman's Court."

Larry has been credited as being the inspiration for the Tea Party movement. (See "Larry Klayman - The One Man TEA Party," by Dr. Richard Swier, http://fwusa.org/KFA)



**Support the work of Freedom Watch at www.FreedomWatchUSA.org**

# EXHIBIT B



©1998, The Washington Post. Photography by Larry Morris. Reprinted with permission.

*...his idea of fun is trying to kick down a door some public official has marked secret...Larry Klayman is himself a conservative, but there's nothing partisan about his indignation.*
—BILL MOYERS, "NOW" PBS

*Larry...I appreciate your own maverick—if we can still use that word!—thinking and stands.*
—FRANK RICH, COLUMNIST FOR *THE NEW YORK TIMES*

*That* Time *magazine has yet to name Larry Klayman "Man of the Year" is a failure of* Time, *not Klayman's. The work he and Judicial Watch did on the Brown case is stunning.*
—JACK CASHILL, AUTHOR OF *RON BROWN'S BODY*

*Larry Klayman is my hero because he has integrity—enough to prevent him from blind loyalty to party or ideology...That's because he is fearless and relentless in the pursuit of justice...There were other men like Larry through American history. Their names were Washington, Jefferson, Madison and Henry.*
—JOSEPH FARAH, WORLDNETDAILY.COM

*...through his challenge of secrecy rules, Larry Klayman has become a force in Washington.*
—LOUIS JACOBSON, *NATIONAL JOURNAL*

*Nobody ever accused Larry Klayman of thinking small, but his latest suit may be outsized by even his standards. The former head of conservative watchdog Judicial Watch who now runs Freedom Watch has filed a $10 trillion class action against Iran at the U.S. District Court for the District of Columbia.*
—*THE NATIONAL LAW JOURNAL*

$26.95

ISBN: 978-0-9792012-2-6

9 780979 201226   5 2 6 9 5

"Larry Klayman stood in the stead for my family and me under very trying circumstances. He is persistent, loyal, and a great believer in the Constitution, as my sons and I are as well. I respect his wisdom and strength and cherish his friendship."

—CLIVEN BUNDY, Nevada Rancher

"While others talk of corruption and injustice in our federal courts, Larry Klayman is a man who has done something about it. As founder of Judicial Watch and Freedom Watch, Larry Klayman became a household name to those of us who want to stop the runaway power of federal judges and restore honesty and integrity to our federal court system. Echoing the sentiments of our Founding Fathers like Thomas Jefferson and James Madison, Larry Klayman has fought for a return to the principles and foundation of our Constitutional Republic wherein people are the source of all power. With over forty years of experience in the practice of law, Larry Klayman has represented defendants across America in defense of their right to 'life, liberty, and the pursuit of happiness.' Larry is a valiant warrior for truth and justice, and a man I am proud to call my friend. I hope that you will enjoy his noble work, *It Takes a Revolution: Forget the Scandal Industry!*"

—CHIEF JUSTICE ROY MOORE

"Klayman's work *It Takes a Revolution: Forget the Scandal Industry!* is brilliant, however unorthodox. But Larry is always right!"

—BEN STEIN, Lawyer, Actor, Writer

"As the father of Navy SEAL Ty Woods, who was killed at Benghazi, I highly recommend this book. Just as Ty was a warrior as a Navy SEAL, as a fellow lawyer and as his friend I can attest to Larry being a warrior in the courtroom."

—CHARLES WOODS, Father of Navy SEAL Ty Woods

"I admire Larry, because he is first and foremost a patriot. He not only believes in the words of the Constitution, he practices those words in all of his endeavors. He was there when I needed him."

—Laura Luhn, Sexual Abuse Victim of Roger Ailes

"Larry Klayman is one of the most principled and intellectual minds in the world of litigation. He believes in fighting for justice at all costs to protect our constitutional freedoms! I am honored to be able to call him a friend and mentor. God brings people into your life for different reasons. I believe that God connected us because he wanted me to have a big brother to encourage me to maximize my potential and guide me in the right direction. Thank you, Larry!"

—Sergeant Demetrick Pennie, President
of the Dallas Fallen Officer Foundation

"Larry Klayman was the only attorney who had the guts to stand beside us and go against the government to get answers when our son, Michael, was killed in Afghanistan aboard Extortion 17 on 08/06/2011. Larry is a bulldog in the courtroom! He helped us win against the NSA, the first time in American history!"

—Charles Strange, Gold Star Father
of PO1 Michael Strange (DEVGRU)

# EXHIBIT C

 **FREEDOM**Watch   JOIN OUR FIGHT AT WWW.FWUSA.ORG

# LARRY KLAYMAN – THE ONE MAN TEA PARTY

By Dr. Richard Swier (Scribe)
RedCounty.com
July 31, 2010

Long before there was a TEA Party, Glenn Beck 912 movement, 13 Patriots and thousands of others, there was Larry Klayman. Larry believes it is more important to be virtuous than be liked.

**Larry believes there is an ultimate right and wrong.**

Some of you may not know Larry Klayman but you should. If you believe in the Constitution of the United States and that the Executive, Legislative and Judicial branches of our federal government are corrupt to the core then you need to read Larry's book, *WHORES: Why and How I Came to Fight the Establishment.*

If you see our courts legislating from the bench rather than enforcing the law as in Arizona then you will love Larry Klayman. If you love politics and want to understand what really happens behind the scenes get his book. I just finished reading WHORES and could not put it down. It is a mosaic of both the man and his struggles against an out of control government bent on aggrandizing itself at the expense of the people and the law. It is about corruption on the part of both parties writ large. I found it particularly interesting because of Larry's insights into Florida politics. You see Larry ran for the very same U.S. Senate seat Marco Rubio is seeking. Larry ran against, among others, Bill McCollum and Mel Martinez. If you want to learn more about Florida politics and political insiders, read this book.

Larry is the founder of Judicial Watch and Freedom Watch USA. Freedom Watch USA "is the only group that speaks through actions, rather than just words." When reading his book I found it a fascinating personal and professional journey that reflects the work of a real patriot. Larry has won my patriot award for being a thorn in the side of Iran, Hugo Chavez, Bill and Hillary Clinton, Dick Cheney, George W. Bush and Barack Obama. Not a bad record if I say so myself.

I really felt a symbiotic relationship with Larry as I read his story. When you speak truth to power you are always attacked. The progressive model is identify the target, marginalize it and then demonize it. That is the cross that Larry, TEA Party members and others who are like minded bear today.

**Larry was fighting the establishment since the early 1990s and he continues to do so even today with the filing of a lawsuit against Elena Kagan, President Obama's nominee for the U.S. Supreme Court.**

According to the WorldNetDaily.com column, *Papers prepped to disbar Elena Kagan*:

One of Washington, D.C.'s most feared and fearless corruption watchers has told WND he intends to file an ethics complaint to have Supreme Court nominee Elena Kagan disbarred from practicing before the court she aspires to join – and possibly subjected to criminal prosecution – for her role in an escalating controversy over partial-birth abortion.

As WND reported, dozens of pro-life organizations are already asking the Senate to investigate Kagan's 1997 amendment to an American College of Obstetricians and Gynecologists report, which was then used by the Supreme Court as justification for overturning Nebraska's partial-birth abortion ban in 2000.

In her confirmation hearings, Kagan defended the amendment, saying, "My only dealings with (the College) were about talking with them about how to ensure that their statement expressed their views."

Several analyses have concluded, however, that Kagan's amendment dramatically changed the meaning of the organization statement, and court records show the statement was passed off on the Supreme Court as official scientific opinion, even though the organization's panel of scientists never approved Kagan's wording.

Klayman told WND he believes Kagan's behind-the-scenes work constitutes "conspiracy to defraud the Supreme Court," and he intends to take the evidence that has been compiled by the pro-life groups to file a complaint before the clerk's office of the U.S. Supreme Court, seeking to have Kagan disbarred as a practicing lawyer infront of the Supreme Court.

So the battle goes on for Larry, you and me. I hope you will read Larry's book and make it a point to learn more about the great work he is doing to stop corruption in our courts, at the White House and in Congress. Larry has been a one man TEA Party, now it is time for us to join with him as we together fight in the same cause – a grass roots revolution to save the Republic.

http://www.redcounty.com/content/larry-klayman-one-man-tea-party

## YOUR HELP IS URGENTLY NEEDED!

**Support our cause and join our fight!**

**Go to www.freedomwatchusa.org/donate**

**Or call 844 FW ETHIC to contribute to Freedom Watch now**



EXHIBIT 2

OFFICE OF DISCIPLINARY COUNSEL

MAR 2 9 2019

RECEIVED



**J.P. Szymkowicz**
**Szymkowicz & Szymkowicz, LLP**
**P.O. Box 57333**
**Washington, DC  20037-0333**
**(202) 862-8500**
**jp@szymkowicz.com**

March 29, 2019



The Honorable Anna Blackburne-Rigsby
Chief Judge
District of Columbia Court of Appeals
430 E Street N.W.
Washington, DC  20001

Robert C. Bernius, Esquire
Chairperson
District of Columbia Board on Professional Responsibility
430 E Street N.W., Suite 138
Washington, DC  20001

James T. Phalen, Esquire
Executive Attorney
District of Columbia Board on Professional Responsibility
430 E Street N.W., Suite 138
Washington, DC  20001

Hamilton P. Fox, III, Esquire
Disciplinary Counsel
District of Columbia Office of Disciplinary Counsel
Building A, Suite 117
515 Fifth Street, N.W.
Washington, DC  20001

    Re:  Complaint Against Deputy Disciplinary Counsel Julia L. Porter based upon
    her Actions and Inactions in Prosecuting Bar Docket #2007-D050 (In the Matter
    of J.P. Szymkowicz)

Dear Chief Judge Blackburne-Rigsby, Mr. Bernius, Mr. Phalen and Mr. Fox:

    This is a letter of complaint against Deputy Disciplinary Counsel Julia L. Porter
that arises out of her conduct during her investigation and prosecution of my father,

John T. Szymkowicz, and me, that began with a bar complaint filed on May 24, 2005, continued with Disciplinary Counsel's filing of a Specification of Charges dated March 30, 2009,[1] and ended on November 23, 2018, with the expiration of Disciplinary Counsel's time to file a motion for *en banc* review of the *per curiam* opinion of the District of Columbia Court of Appeals accepting the Board on Professional Responsibility's conclusion that my father and I did not violate the Rules of Professional Conduct.  This case lasted for 13 years, 6 months and 30 days.

I ask that the Board on Professional Responsibility appoint Mr. Phalen, as the Executive Attorney, to "act as Special Disciplinary Counsel" pursuant to Rule XI, Section 7 (a) (8) of the Rules Governing the District of Columbia Bar, and investigate this matter pursuant to Rule XI, Section 8 (a) of the Rules Governing the District of Columbia Bar in order to avoid the conflict of interest that would result if the Office of Disciplinary Counsel were to investigate this matter.

## I.    BACKGROUND OF ACKERMAN LITIGATION AND DISCIPLINARY COUNSEL'S SPECIFICATION OF CHARGES.

Ms. Porter's prosecution of my father and me was based on my law firm's representation of Dr. Stephen J. Ackerman, Jr. and his mother, Genevieve Ackerman, with regard to a "Revocable Trust" established on May 21, 2002.  Hearing Committee's Findings of Fact 8.  Mrs. Ackerman and her husband, Stephen Ackerman, Sr., had two children, Mrs. Abbott and Dr. Ackerman.  Ms. Abbott, "took the lead in establishing the trusts for her parents by engaging the services of [Tas Coroneos, an attorney who is now working as a real estate agent in Florida], who drafted the documents and supervised their execution." *Id. See also* https://www.taspowerof2.com.  "Mrs. Abbott signed [the trust documents] on behalf of both of her parents as their attorney-in-fact pursuant to Powers of Attorney in favor of Mrs. Abbott." *Id.*

Beginning in 2002, my law firm represented Dr. Ackerman in the District of Columbia Superior Court in his effort to "reform the trust to [Mrs. Ackerman's intent]," but the Superior Court ruled against Dr. Ackerman.  *Id.* at 10.  My law firm also represented Mrs. Ackerman by filing an action in the Superior Court "for the purpose of revoking the trust and returning control of the trust assets to Mrs. Ackerman."  *Id.* at 10-11.  After the trustee's counsel notified my father that he intended to call my father as a witness during the trial in Mrs. Ackerman's case, my father was forced to withdraw as Mrs. Ackerman's counsel pursuant to Rule 3.7 of the District of Columbia Rules of Professional Conduct, and successor counsel, Leslie Silverman, began representing Mrs. Ackerman.  *Id.* at 11.  My law firm continued, however, to represent Dr. Ackerman in a proceeding brought by the trustee in the Superior Court to transfer a home on North

---

[1]    Pursuant to the Rules Governing the District of Columbia Bar, Ms. Porter verified the Specification of Charges dated March 30, 2009 by stating "I do affirm that I verily believe the facts stated in the Specification of Charges to be true."

RX0792

Carolina Avenue into Mrs. Ackerman's trust.  *Id.*  Ultimately, Mrs. Ackerman and Dr. Ackerman lost in all of the actions filed in the Superior Court.  *Id.* at 11-12.

In a 35-page Specification of Charges dated March 30, 2009, Ms. Porter charged my father and me with several violations of the Rules of Professional Conduct, which the Hearing Committee summarized as follows:

> Bar Counsel charges that, during their representation of Mrs. Ackerman, Respondents engaged in conflicts of interest, dishonesty, fraud, and other ethical violations . . . Bar Counsel's prosecution rests on the contention that Mrs. Ackerman is 'incompetent' because she suffers from dementia, 'cognitive impairment' and 'memory problems,' and therefore was mentally incapable of hiring or directing a lawyer, and was unable to understand or process anything of a complex nature.  Bar Counsel asserts that Mrs. Ackerman was an unknowing party to litigation that was brought in her name, because it was not in her interest.  Instead, Bar Counsel argues that the litigation was intended only or primarily to benefit her son, Dr. Ackerman, to Mrs. Ackerman's financial detriment.  These contentions were initiated and are primarily supported by the testimony of Bar Counsel's complaining witness, Mrs. Abbott.  *Hearing Committee's Findings of Fact 12-13.*[2]

> Moreover, the Hearing Committee found that there was a "close connection between the case Mrs. Abbott prepared for Bar Counsel to support Mrs. Abbott's complaints and the case Bar Counsel actually presented against Respondents."  *Hearing Committee's Findings of Fact 18-19*.

## II.    SUMMARY OF DISCIPLINARY PROCEEDINGS.

### A.    Proceedings Before the Hearing Committee.

The proceedings before the Hearing Committee began on October 13, 2009, and ended after 12 days of testimony on March 10, 2010.  The Hearing Committee's Findings of Fact and Proposed Recommendations of Law, which were issued on September 28, 2012, covered 161 pages, not including a 62-page appendix that cited to evidence introduced during the proceedings.  The Hearing Committee that:

---

[2]    The Hearing Committee found that "Mrs. Abbott's anger and resulting hostility to Respondents makes her *opinion* [emphasis in original] testimony against Respondents unreliable."  Hearing Committee's Findings of Fact 21.  Moreover, the Hearing Committee found that "Mrs. Abbott's hostile, bitter statements and uncorroborated testimony cannot be accepted as reliable or even relevant evidence against Respondents."  *Id.*

RX0793

¶306.  The Hearing Committee has listened to arguments and testimony for twelve hearing days, carefully reviewed over 3,800 pages of transcript (including the two pre-hearing conferences) and several more thousand pages comprising the 228 exhibits admitted in evidence, and considered the arguments set forth in the approximately 300 pages of briefs submitted by the parties.  This careful review enables us to say, with confidence, that **there is no credible evidence, much less clear and convincing evidence, supporting any of Bar Counsel's charges**.  [emphasis added].

. . .

¶307.  It is easy to understand why Mrs. Ackerman yearned for peace in her family. Throughout the years described in this record, there was no peace in the Ackerman family. It is also easy to understand Mrs. Abbott's anger at the situation with which all participants in this tragic drama were faced. The palpable anger and resulting hostility of Mrs. Abbott towards the Respondents is misplaced, however.

¶308.  We do not contest her right to express her opinions on any topic of her choosing, including the behavior of Respondents. However, that anger should not have affected Bar Counsel's investigation in this matter. It is nevertheless clear that Mrs. Abbott's "case" against the Respondents became Bar Counsel's "case" against Respondents.[3] Bar Counsel asked Mrs. Abbott to attest to the truthfulness of her complaining letters.  But Bar Counsel's charges were substantially undermined by Mrs. Abbott's hostility and bias against Respondents, as clearly demonstrated in Mrs. Abbott's cross-examination. Further, Bar Counsel's serious misunderstanding of District of Columbia law with respect to mental capacity and consequently her failure to show that Mrs. Ackerman lacked capacity to interact with Respondents requires that the charges be dismissed against all Respondents, [expect for the Rule 1.5 violation by Mrs. Ackerman's subsequent counsel, Robert King]. *Findings of Fact 155-56.*

---

[3]    In an email dated November 8, 2008 at 10:31 p.m. from Mrs. Abbott to Ms. Porter, Mrs. Abbott describes her filing of an ethics complaint about an accountant in order to obtain information instead of "go[ing] to court to force the issue."  In response to that ethics complaint, Mrs. Abbott's counsel "very soon heard from [the accountant's counsel], we made our demands, and everything we requested has been provided." Mrs. Abbott's email concludes by stating, "So thank you, Julia, for what I have learned. I figure I saved over $8,000 by filing an ethical complaint as opposed to going back to court – probably even more.  Til later, thanks again – Fran."

RX0794

## B.      Proceedings Before the Board on Professional Responsibility.

The Board on Professional Responsibility, in a 35-page opinion issued on July 25, 2014, dismissed all charges against my father and me.  The Board found that "[d]espite the *quantity* of evidence urged by Bar Counsel, when we account for the Hearing Committee's *qualitative* credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents." [italics in original].  *Opinion* 3.  The Board also found that "[a]lthough Bar Counsel decries as 'almost philosophical' some of the legal issues discussed by the Hearing Committee, there is no meaningful challenge to the germane legal reasoning contained in the Committee's report."  *Opinion* 3.  The Board found that I "never interacted personally with Mrs. Ackerman."  *Opinion* 16.  The Board further observed that:

> Denigrating the Hearing Committee's rejection of its evidence, Bar Counsel aggressively criticizes its 'failure to consider much, if not most, of the evidence' or 'even to acknowledge it,' and characterizes this purported failing as a 'dereliction of [its] responsibility.' (Bar Counsel's Brief before the Board at 48-49).  The *ad hominem* attack on the Hearing Committee's work product is unfortunate. The Hearing Committee did consider countervailing evidence (see, e.g. Hearing Committee's Findings of Fact at 79-93)  The fact that it did not swell its report beyond 219 pages, further to detail evidence it found unpersuasive, does not mean the Committee ignored it."  *Opinion 17.*

The Board, with regard to me, found:

> [W]e reject Bar Counsel's claim that J.P. Szymkowicz violated Rule 1.7 (b) (2) for an additional reason.  Although he appeared on behalf of Mrs. Ackerman in the litigation, his role was entirely secondary to his father's. He never spoke to Mrs. Ackerman.  He had no reason to discuss any conflict issues with her because his father had 'satisfied any inquiry he had about that.  His father had a demonstrated history of being sensitive to, and vetting, conflicts in the past.  J.P. Szymkowicz understood that his father would 'not do anything on behalf of his clients unless they understand what's going on, and the ramifications of what they are going to do.  If there is a potential conflict, any potential conflict, . . . he's very, very thorough and takes sometimes hours discussing these kind of issues with clients, and that happens in every case.'  J.P. Szymkowicz was entitled to rely on [John T. Szymkowicz's] determination of Mrs. Ackerman's capacity.  He neither knew of, nor ratified, any improper conduct of his father.  As a consequence, he did not have disciplinary liability for any failure of his father in that regard.  [*citing* D.C. Bar Rule of Professional Conduct 5.1, Comment 6].  *Opinion 27.*

RX0795

### C.      Proceedings Before the Court of Appeals.

In a 27-page *per curiam* opinion issued on September 17, 2015, the Court of Appeals dismissed all charges against my firm, except that it remanded the case to the Board on Professional Responsibility for "further consideration of the conflict-of-interest charges" because "the Szymkowiczes could not properly represent both Ms. Ackerman and Dr. Ackerman without obtaining informed consent to the joint representation. Because it concluded that informed consent was not required, the Board did not decide whether informed consent was obtained." *Opinion 21-22, 27.*  The Court of Appeals further found that:

> The Board ruled in the alternative that Mr. J.P. Szymkowicz did not violate the conflict-of-interest rule because he reasonably relied on Mr. J.T. Szymkowicz's assurances that any conflict issues had adequately been addressed.  Because it is possible that the Board's assessment of that issue could be affected by the Board's determinations on remand, we also remand as to the conflict-of-interest charge against Mr. J.P. Szymkowicz. *Opinion 22 n.2.*

### D.      Proceedings on Remand Before the Board on Professional Responsibility.

On May 19, 2017, the Board on Professional Responsibility issued a 36-page report and recommendation on remand from the Court of Appeals.  This report, after a lengthy discussion of the law on capacity and burdens of proof, found that "Disciplinary Counsel failed to prove by clear and convincing evidence that the Szymkowiczes failed to obtain informed consent pursuant to Rule 1.7 (c) after [John T. Szymkowicz] offered evidence of informed consent." *Report 23.*  This report also finds that "[b]ased on this conclusion, we also see no reason to revisit our previous finding that [J.P. Szymkowicz] reasonably relied on his father's assurances that he had obtained Mrs. Ackerman's informed consent under Rule 5.2 (subordinate lawyers)." *Report 25.*  Thus, the Board "recommends that the case against the Szymkowiczes be dismissed." *Report 35.*

### E.      Proceedings in the Court of Appeals after Remand to the Board on Professional Responsibility.

On November 8, 2018, the Court of Appeals held, in a 16-page opinion, that the record supports the Board's conclusion that Disciplinary Counsel failed to carry the burden of proving by clear and convincing evidence that Mrs. Ackerman did not give informed consent to my firm's representation.  With regard to me, the Court found that:

> Although John P. Szymkowicz did not personally discuss conflicts of interest with Ms. Ackerman, the Board concluded that John P.

6

Szymkowicz reasonably relied upon assurances from his father on the issue.  We do not understand Disciplinary Counsel to argue at this juncture that John P. Szymkowicz violated Rule 1.7 even if his father did not.  *Opinion 6-7*.

## III.   MRS. ABBOTT'S COUNSEL NEVER ASKED A COURT TO IMPOSE SANCTIONS DURING LITIGATION AND NEVER FILED A BAR COMPLAINT.

During the litigation of the cases underlying this disciplinary proceeding, Mrs. Abbott's counsel, George Huckabay, never asked a court to impose sanctions for frivolous behavior and did not file a bar complaint to Disciplinary Counsel as he was required to do under Rule 8.3 (a) of the Rules of Professional Conduct if he believed that my father or I committed a disciplinary violation.  Rule 8.3 (a)  states:

A lawyer who knows that another lawyer has committed a violation of the Rules of Professional Conduct that raises a substantial question as to that lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects, shall inform the appropriate professional authority.

Mr. Huckabay also did not testify against me or my father during the proceedings before the Hearing Committee, even though he had numerous dealings with my father in the various cases involving Dr. Ackerman and Mrs. Ackerman.  Had he testified before the Hearing Committee, Mr. Huckabay would have testified that he never had a substantive discussion about the Ackerman matters with me, and that his interactions with me were limited to such things as asking to speak with my father or communications on non-substantive matters, such as when documents would be produced or what days were good for scheduling purposes.

## IV.   MS. PORTER'S ACTIONS THAT VIOLATE THE RULES OF PROFESSIONAL CONDUCT.

### A.    Ms. Porter's Four Year Investigation of the Charges against My Law Firm.

Ms. Porter's initial investigation of the facts surrounding Mrs. Abbott's bar complaint lasted between May 24, 2005, when the complaint was made, and March 30, 2009, when she filed the Petition Instituting Formal Disciplinary Proceedings with the Board on Professional Responsibility.  During the entire time that this action was pending, six central witnesses in this case died, including Genevieve Ackerman, who was the key figure in the drama; Stephen J. Ackerman, Sr., her husband; Herbert Callihan, her attorney prior to the time my law firm represented her; Kenneth Loewinger, her court-appointed attorney after my firm's representation of her ended; George Huckabay, her daughter's attorney in all of the proceedings in which my firm represented Ms. Ackerman and her son; and finally, her son, Stephen J Ackerman, Jr.

RX0797

By the time the Hearing Committee began its 12 days of hearing, Mrs. Ackerman was unable to testify on my firm's behalf due to injuries she suffered in a fall in 2007, and Stephen J. Ackerman, Sr. and Mr. Callihan were dead.  By the time my firm began its defense before the Hearing Committee on December 1, 2009, Mr. Loewinger had died as well.  Melvin Bergman, the attorney for Co-Respondents Leslie Silverman and Robert King, died prior to the final resolution in the Court of Appeals.

The result of Ms. Porter's almost four-year delay in filing her Petition Instituting Formal Disciplinary Proceedings was that my firm did not have the ability to call witnesses (including Mrs. Ackerman herself) who would have corroborated my father's testimony that Mrs. Ackerman possessed the capacity to enter into a legal contract, that she had the ability to convey her wishes to my father and that she had the ability to receive information and provide informed consent to the legal strategy employed by my father on her behalf.  Instead, the Hearing Committee was not able to hear from those individuals, and thus, as a result of Ms. Porter's delay, my father could defend himself against Ms. Porter's allegations by calling only three witnesses besides my father and me to testify before the Hearing Committee:  Dr. Richard Ratner, who evaluated Mrs. Ackerman as a psychiatrist, and Mrs. Ackerman's successor counsel, Leslie Silverman and Robert King.  Had proceedings before the Hearing Committee began within a few months of Ms. Porter receiving Mrs. Abbott's bar complaint in May 2005, the Hearing Committee would have heard directly from Mrs. Ackerman and determined for themselves that she possessed the capacity to enter into a legal contract, that she had the ability to convey her wishes to my father and that she had the ability to receive information and provide informed consent to the legal strategy employed by my father on her behalf.  If testimony from Mrs. Ackerman was not enough to exonerate my law firm, my father would have also called Herbert Callihan, who was Mrs. Ackerman's previous attorney, and Kenneth Loewinger, her court-appointed counsel, to testify as to Mrs. Ackerman's capacity, wishes and informed consent to my father's legal strategy. Instead, Ms. Porter's four-year delay in bringing this case to trial left my father with no "third-party" witness except for Dr. Ratner to corroborate my father's testimony.

I believe that the evidence is clear that Ms. Porter used delay as a procedural weapon against my law firm since she "ran out the clock" on Mrs. Ackerman's ability to recall facts and events (Mrs. Ackerman was almost 88 years old in May 2005, when Mrs. Abbott first complained to the Disciplinary Counsel about my law firm) by waiting almost four years to file her Petition Instituting Formal Disciplinary Proceedings.  It is not difficult to imagine that an 88-year-old's memory of detailed facts related to legal proceedings would fade after four years.  In fact, by the time the Hearing Committee heard the case in late-2009, Mrs. Ackerman had fallen (sometime in 2007), and apparently, lost much, if not all, of her ability to remember simple day-to-day details of her life, and thus, Mrs. Ackerman was therefore unable to testify before the Hearing Committee.  This extensive delay significantly prejudiced my firm's defense against Ms. Porter's charges.

RX0798

In "*Lowering the Bar:  How Lawyer Discipline in New York Fails to Protect the Public*," 17 N.Y.U. J. Legis. & Pub. Pol'y 485, 496 (2014), Professor Stephen Gillers of the New York University Law School, states that an "[u]nacceptable delay" "undermines the goals of discipline" and provides the following example of an "unconscionably long" delay – "Imagine misconduct in year one, charges in year two, and suspension from practice or disbarment in year four.  A lawyer who deserves suspension will have been able to practice for three years after the misconduct that supports the suspension or disbarment."  It is important to again note that Ms. Porter waited almost four years to file the Petition Instituting Formal Disciplinary Proceedings, and during this long period of time, Mrs. Ackerman's memory faded with advanced age and other witnesses died.

Should Ms. Porter claim that she waited to file the Petition Instituting Formal Disciplinary Proceedings until the conclusion of all of the proceedings involving Mrs. Ackerman, I urge you to consider the American Bar Association Report of the Commission on Evaluation of Disciplinary Enforcement dated September 18, 2018.  This report states in the comment section of Recommendation 12 that "A disciplinary case should not be suspended or delayed because of a pending civil or criminal case involving the same facts except upon a determination by the state disciplinary board that good cause exists to do so, consistent with [the ABA Model Rules for Lawyer Disciplinary Enforcement]."

The  Standing Committee on Professional Discipline of the American Bar Association's Center for Professional Responsibility, in its "2016 Survey on Lawyer Discipline Systems," found at https://www.americanbar.org/content/dam/aba/ administrative/professional_responsibility/2016sold_results.pdf, published a Chart, found at Chart VI, entitled "Case Processing Times."  This chart published the number of days it took for a particular disciplinary case to proceed through the system at different stages of the process for most of the jurisdictions in the United States.  One chart that is relevant to my case is the "Average Time from Receipt of Complaint to Filing of Formal Charges."  Most states accomplish this goal within a year; only six states reported times greater than one year.  Ms. Porter took almost four years to file formal charges against my father and me.

Ms. Porter, on page 16 of Disciplinary Counsel's March 29, 2018 brief to the Court of Appeals, cavalierly treats my law firm's delay and due process arguments:

> The charges in this case were submitted in March 2009, six months before the Szymkowiczes stopped litigating against Ms. Ackerman's trust.  Disciplinary matters take time to resolve, particularly when years elapse over the course of the hearing, the Committee's report, the Board report, and the appeal.  . . . They have been permitted to practice law during the entire period these matters were pending and a sanction for their misconduct has yet to be imposed.  . . . Their complaint about the expense also has no place in this appeal.  They chose to retain counsel.

RX0799

I believe that the evidence is clear that Ms. Porter used delay as an offensive weapon against my law firm in order to run out the clock on my firm's ability to call Mrs. Ackerman and others as witnesses during the proceedings before the Hearing Committee.

**1.   Ms. Porter's November 2005 interview with Mrs. Ackerman.**

In 2005, after receiving Ms. Porter's request for information about Mrs. Ackerman's case, my father invited and encouraged Ms. Porter to meet with Mrs. Ackerman, outside of the presence of my father and her son, Stephen J. Ackerman, Jr., so that Ms. Porter could hear directly from Mrs. Ackerman what the elderly woman wanted and what information my father had provided to Mrs. Ackerman with regard to the course of action ultimately undertaken by my law firm.  Upon information and belief, Ms. Porter and an investigator from the Office of Disciplinary Counsel met with Mrs. Ackerman in November 2005 as suggested by my father.  This meeting is significant because one of two things occurred at that time, either:  (1) Mrs. Ackerman was fully aware of the case filed by my law firm and had received information from my father sufficient to provide him with informed consent to the plan for litigation that my father employed, or (2) Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions, and thus, could not provide informed consent to my father's litigation plan.  If Mrs. Ackerman was fully aware of the case filed by my law firm and had received information from my father sufficient to provide him with informed consent of the plan for litigation that my father employed, Ms. Porter's investigation should have ended there.  If Ms. Porter found that Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions, she had the duty to immediately file a Petition Instituting Formal Disciplinary Proceedings, rather than waiting more than three years - until March 30, 2009 - to do so, in order to protect Mrs. Ackerman from further harm and to protect the general public from an unethical attorney.

**a.   Ms. Porter should have recused herself from prosecuting her case against my father and me based on the fact that she interviewed Mrs. Ackerman.**

Once Disciplinary Counsel filed the Petition Instituting Disciplinary Proceedings, Ms. Porter should have recused herself under Rule 3.7 of the Rules of Professional Conduct (which requires lawyers to recuse themselves if they are likely to be a necessary witness during trial) so that she and her investigator could have testified against my father in the proceedings before the Hearing Committee (assuming that she found that Mrs. Ackerman lacked the capacity to understand the nature and effect of her actions).  While Ms. Porter called many witnesses before the Hearing Committee to testify generally about Mrs. Ackerman's purported incapacity, she did not testify herself or call her investigator to testify.  This omission is glaring because if she or her investigator had believed that Mrs. Ackerman lacked capacity to understand the nature

10

and effect of her actions, based on their November 2005 meeting with the central figure in this case, surely Ms. Porter would have introduced this evidence during the proceedings before the Hearing Committee.  The obvious answer is that Ms. Porter and her investigator did not find that Mrs. Ackerman lacked capacity to understand the nature and effect of her actions during their interview, and rather, found Mrs. Ackerman to be, as my father testified, steadfast in her desire to take the actions suggested by my father after he provided her with information that was sufficient to allow her to provide informed consent to this plan of action.

### B.    Ms. Porter's Failure to Dismiss the Case Against Me after the Hearing Committee Issued its Report and Recommendations in September 2012.

While Mrs. Abbott did not originally include me in her May 24, 2005 bar complaint against my father, she later filed a separate bar complaint against me on February 12, 2007.  In response to that bar complaint, I sent Ms. Porter a letter on March 28, 2007 that rebutted each and every statement in Mrs. Abbott's February 12, 2007 complaint against me.  This letter detailed what I did - and what I did not do - with respect to the various proceedings in the Ackerman cases.  The Hearing Committee found that "JPS had a limited role with respect to in-person meetings with both Dr. Ackerman and Mrs. Ackerman and with respect to appearing in court in all relevant matters for those clients. *Findings of Fact 94*.  The Hearing Committee cited Rule 5.2 of the Rules of Professional Responsibility in its Findings of Fact:

¶191.  Rule 5.2 governs the responsibilities of subordinate lawyers.  In its entirety, Rule 5.2 states:

(a)    A lawyer is bound by the Rules of Professional Conduct notwithstanding that the lawyer acted at the direction of another person.

(b)    A subordinate lawyer does not violate the Rules of Professional Conduct if that lawyer acts in accordance with a supervisory lawyer's reasonable resolution of an arguable question of professional duty.

Comment (2) to Rule 5.2 further provides:

When lawyers in a supervisor-subordinate relationship encounter a matter involving professional judgment as to ethical duty, the supervisor may assume responsibility for making the judgment. Otherwise a consistent course of action or position could not be taken. If the question can reasonably be answered only one way, the duty of both lawyers is clear and they are equally responsible for fulfilling it. However, if the question is reasonably arguable,

RX0801

someone has to decide upon the course of action. That authority ordinarily reposes in the supervisor, and a subordinate may be guided accordingly. *For example, if a question arises whether the interests of two clients conflict under Rule 1.7, the supervisor's reasonable resolution of the question should protect the subordinate professionally if the resolution is subsequently challenged.* [*italics in original*].

. . .

¶193.  Thus, JPS was entitled to rely on the judgment of JTS as to whether Mrs. Ackerman had validly waived the conflict of interest with Dr. Ackerman, so long as JTS' resolution of that issue was 'reasonable' which we have found to be the case.  JPS was therefore entitled to rely on JTS' resolution of that issue.  *Findings of Fact 97-98.*

After the Hearing Committee issued its Findings of Fact, Ms. Porter had a duty to dismiss me from the proceedings unless she could prove that my reliance on my father's resolution of the issue that Mrs. Ackerman waived the conflict of interest with her son was "unreasonable."  Rather than dismissing me from the proceedings, Ms. Porter filed Exceptions to the Hearing Committee's Findings of Fact and Conclusions of Law before the Board on Professional Responsibility, Exceptions to the Board's Order before the Court of Appeals, a Brief before the Board on Professional Responsibility on remand, and finally, a brief before the Court of Appeals after remand to the Board on Professional Responsibility.

On pages 42 to 45 of Disciplinary Counsel's brief before the Court of Appeals dated December 12, 2014, pages 22 to 23 of Disciplinary Counsel's Brief on remand to the Board on Professional Responsibility dated November 23, 2015 and pages 15 to 16 of Disciplinary Counsel's brief before the Court of Appeals dated March 29, 2018, Ms. Porter attempted to address, the reasonableness of my reliance on my father's belief that Mrs. Ackerman had capacity to understand the nature and effect of her actions and that my father had obtained Mrs. Ackerman's consent to the legal strategy employed. Instead of discussing whether my reliance on my father's statements to me about the Ackerman litigation was reasonable or not, Ms. Porter made arguments such as "[J.P. Szymkowicz] took no steps to ascertain that his father had made the necessary disclosures, or that Mrs. Ackerman understood and appreciated her risks and alternatives" and "[w]ith access to the medical reports and Ms. Ackerman's testimony showing her cognitive and memory deficits, [J.P. Szymkowicz] cannot escape responsibility for knowing of her compromised condition," ," *Disciplinary Counsel's December 12, 2014 Brief to Court of Appeals 45*; *Disciplinary Counsel's March 29, 2018 Brief to Court of Appeals 16.*

RX0802

The transcript of the proceedings before the Hearing Committee shows that there was extensive testimony that concerns (a) my reliance on my father's statements that Mrs. Ackerman was competent [*See Tr. 1671, 1770-1771*], (b) my reliance on my father's statements that Mrs. Ackerman waived any conflict of interest between her and her son [*See Tr. 1705-1706, 1910-1912*] and (c) my belief of my father's truthfulness based on years of knowing him [*See Tr. 1682-1685, 1910-1912*].  Rather than address Rule 5.2, concerning the responsibility of "subordinate lawyers," Ms. Porter attempted to "lump" me in with my father with regard to distinct acts in which he allegedly participated in order to "keep me in the case."

> **1.      Ms. Porter's false statements to the Board on Professional Responsibility and the Court of Appeals that were made to "keep me in the case."**

Ms. Porter made false statements to the Board on Professional Responsibility and the Court of Appeals about what I did (or did not do) that had no support in the record whatsoever.  Ms. Porter made these false statements with the purpose of clouding the issue of what specifically I did or did not do and did so in an effort to have the Board and Court punish me, in addition to my father, in case he was found to have committed violations of the Rules of Professional Conduct.  Ms. Porter's actions to "lump" me  in with my father with regard to his interactions with Mrs. Ackerman did not occur before the Hearing Committee, presumably because the Hearing Committee would have "caught" her in her deception, but did occur during proceedings before the Board on Professional Responsibility and the Court of Appeals (which did not have the detailed recollection of the facts that the Hearing Committee had).  For example, before the Hearing Committee, Ms. Porter, used language that did not include me, such as "JTS and SA Jr. induced Mrs. Ackerman to sign a new complaint against Frank Abbott by telling her that it would end the litigation."  Disciplinary Counsel's April 19, 2010 Brief to the Hearing Committee 35.  Ms. Porter's choice of language in filings before the Board on Professional Responsibility and the Court of Appeals was intentional, in the sense that she had actual knowledge that what she wrote was misleading, at best, or outright false, at worst, and her falsehoods were material to the proceeding, in the sense that she wanted to "exaggerate" my involvement (or lack thereof) in the case to keep me in the case after the Hearing Committee found in my favor.  These false statements include:

> a.      "the Szymkowiczes had promised Mrs. Ackerman that they would drop the litigation if she revoked the trust."  *Disciplinary Counsel's Brief before the Court of Appeals dated December 12, 2014 at 13*.  [There is no evidence in the record that I "promised" Mrs. Ackerman anything].

> b.      "the other Respondents, Silverman and King – even when they were brought in – first, they were brought in by the Szymkowiczes and the son."  *Transcript of June 3, 2015 Oral Argument before the Court of*

RX0803

*Appeals 13.* [There is no evidence in the record that I "brought in" Ms. Silverman or Mr. King].

c.      "The Szymkowiczes and [Dr.] Ackerman persuaded Ms. Ackerman to sign the complaint initiating Ackerman II, by promising her that her son would dismiss or drop his own case and 'end the litigation.'"  *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 12.*  [There is no evidence in the record that I "persuaded" Mrs. Ackerman to do anything].

d.      "The POAs and other documents that the Szymkowiczes had Ms. Ackerman sign in favor of her son also gave rise to conflicts."  *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 13.*  [There is no evidence in the record that I "had Mrs. Ackerman sign" anything].

e.      "[I]n November 2005, the Szymkowiczes had Ms. Ackerman execute a new POA in favor of her son, as well as other documents including a revocation of her trust, that also benefitted her son."  *Disciplinary Counsel's Brief before the Board on Professional Responsibility dated November 23, 2015 at 14.*  [There is no evidence in the record that I "had Mrs. Ackerman execute" anything].

f.      "The Szymkowiczes first assisted the son in filing a lawsuit, to dispute the trust and secure one of the properties for himself, despite the clause disinheriting beneficiaries who challenged the trust.  Three years later they undertook to represent his mother at the same time, promising that her son would drop his suit if she litigated to under to trust herself."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 2-3.*  [There is no evidence in the record that I ever "promised" Mrs. Ackerman anything].

g.      "The Szymkowiczes secured other POAs in the son's favor on November 22, 2005, and then repeatedly had his mother execute new POAs in his favor over the next 15 months."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 10.*  [There is no evidence in the record that I "secured" any document from Mrs. Ackerman].

h.      "One or both Szymkowiczes took part in many of these communications [with successor counsel Leslie Silverman and Robert King]."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 15.*  [There is no evidence in the record that I "took part" in any substantive "communications" with Ms. Silverman or Mr. King].

14

i.       "None of the lawyers discussed the documents [Mrs. Ackerman's new will and an assignment of assets to Dr. Ackerman] with her, or the risks, alternatives, or implications of signing them.  They gave them to her son, informing him that he could sign the Assignment for her under authority of a POA."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 15*.  [There is no evidence in the record that I "gave" Dr. Ackerman a copy of Mrs. Ackerman's will or assignment of assets or "informed" him that he could sign the Assignment to her under authority of a POA].

j.       "in November 2007, Stephen Ackerman, Jr. tried an almost opposite approach – with cooperation from all four lawyers.  After contacting the D.C. Agency on Aging, he petitioned the Probate Court for appointment as his mother's guardian and conservator because she was incapacitated (he claimed, as a result of macular degeneration, but he verified that she lacked capacity to care for herself or to obtain, administer or dispose of property and income)."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 18-19*.  [There is no evidence in the record that I "cooperated" with Stephen Ackerman, Jr. in "contacting the D.C. Agency on Aging or "petitioning" the Probate Court].

k.       "The record evidence does not support the Board's finding that the Szymkowiczes ended their representation of Ms. Ackerman on March 7, 2017 – the day JTSzymkowicz and Silverman filed a praecipe in Ackerman II substituting the latter for the former as Ms. Ackerman's counsel in the litigation.  Rather, clear record evidence demonstrated that the Szymkowiczes continued to act as counsel for Ms. Ackerman in their subsequent meetings, and when they prepared legal documents for her to sign that they maintained and used."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 44*.  [There is no evidence in the record that I "prepared legal documents" for Mrs. Ackerman to sign].

l.       "Silverman and King acted in concert with Stephen Ackerman, Jr. and the Szymkowiczes from whom they got their information."  *Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018 at 47*. [There is no evidence in the record that I provided "information" to Ms. Silverman or Mr. King].

m.       "That the Szymkowiczes withdrew as counsel in Ackerman II because Mr. Szymkowicz was going to be a witness.  The assignment was actually signed in August of 2007 which was around the time that Mr. Szymkowicz or the Szymkowiczes created the document."  *Timestamp*

RX0805

*14:32 of the April 11, 2018 oral argument in the Court of Appeals.* [There is no evidence in the record that I "created" this assignment].

n.      "I think there's more than clear and convincing evidence in the record, particularly from the perspective of Ms. Ackerman, who, while the Szymkowiczes may - who withdrew as counsel in the Ackerman II case, continued to be involved in every legal matter that she – going forward.  It was basically a seamless, I guess, representation as far as Ms. Ackerman was concerned." *Timestamp 25:38 of the April 11, 2018 oral argument in the Court of Appeals.* [There is no evidence in the record that I was "involved" in Stephen Ackerman, Jr.'s Petition for Guardianship of Mrs. Ackerman, Probate Intervention Case Number 407-07. Stephen Ackerman, Jr. originally filed this Petition *pro se*, but later retained Claude Roxborough, Esquire as his counsel in this proceeding].

o.      "The power of attorney.  Her daughter had been taking care of all of her needs, all of her financial obligations since her stroke in the late nineties.  This was going to change things dramatically.  And, again, no disclosure, no explanation about the risk, the alternatives, so it didn't give Ms. Ackerman the information that she needed, not only with respect to the litigation, but with respect to the other, I guess, transactions, or documents that the Szymkowiczes had Ms. Ackerman sign." *Timestamp 31:34 of the April 11, 2018 oral argument in the Court of Appeals.* [There is no evidence in the record that I "had Mrs. Ackerman sign" anything].

The result of Ms. Porter's false and misleading statements to the Board on Professional Responsibility and the Court of Appeals is that I was "kept in the case" for six more years after the Hearing Committee found that I "reasonably rel[ied] on JTS's determination of Mrs. Ackerman's capacity and her waiver of any conflict."  Hearing Committee's Findings of Fact and Proposed Conclusions of Law at 101.

**C.      The Investigation into Ms. Porter's Conduct should look into whether Ms. Porter used her Former Colleague, Professor Michael Frisch, and his "Legal Profession Blog" to Tarnish my Law Firm in the Legal Community and Improperly Influence the Board on Professional Responsibility and Court of Appeals (and its Law Clerks) to Side with Disciplinary Counsel against my Law Firm.**[4]

The investigation into Ms. Porter's conduct should look into whether Ms. Porter used her former colleague at the Office of Disciplinary Counsel and current colleague at Georgetown University Law Center, Professor Michael Frisch, to tarnish my law firm's

---

[4]      Printouts of Professor Frisch's blog posts related to this case are attached in the Appendix attached to this letter.

16

reputation in the legal community and improperly influence the Board on Professional Responsibility and Court of Appeals (and its law clerks) to side with Disciplinary Counsel against my law firm.  Professor Frisch publishes an influential "Legal Profession Blog," found at https://lawprofessorstypepad.com/legal_profession. Professor Frisch and Ms. Porter are both adjunct professors of law at the Georgetown University Law Center who teach courses in professional responsibility. *https:www.law.georgetown.edu/faculty/michael-s-Frisch/* and *https:www.law.georgetown.edu/faculty/julia-l-porter/.*

I do not recall that Professor Frisch attended any of the proceedings before the Hearing Committee in my case; accordingly, he would not have had the personal knowledge sufficient to provide any "color" to the reporting on my case that he provided on his blog.  The statements he published in his blog about my case provided a "slanted" view against my firm and in favor of Mrs. Abbott and Ms. Porter, and it would have been virtually impossible for him to have come to the conclusions that he made based on a reading of the Hearing Committee's Findings of Fact and Conclusions of Law alone.

In an article published on Professor Frisch's blog on August 17, 2018 entitled "D.C. Disciplinary Counsel has New Leadership," Professor Frisch stated:

> The District of Columbia Office of Disciplinary Counsel has its top positions in place with the elevation of Julia Porter to Deputy Disciplinary Counsel.  With Phil Fox and Ms. Porter at the helm, the office is blessed with effective leadership for the first time in decades.  Thus one will likely see fewer of the cases that take eight or more years to investigate and a decade or more to go from soup to nuts. . . . Disclosure: Deputy Porter and I were colleagues at Bar Counsel for a decade, regularly co-counseled cases and have co-taught ethics courses at Georgetown Law for many years.  **I am biased in her favor**.  [emphasis added].

An investigation into Ms. Porter's conduct in my case might also consider looking into whether Ms. Porter was connected to an article published in the Summer 2014 issue of the Georgetown Journal of Legal Ethics entitled "Clients with Diminished Capacity Seek Attorneys with Augmented Integrity" by Georgetown Law student Liza Magley.  *27 Geo. J. Legal Ethics 705*.

**1.      Professor Frisch's October 22, 2012 Blog Post.**

The first article that Professor Frisch wrote about my case is "The Worst Hearing Committee Report in D.C. History," published on his blog on October 22, 2012.  This article states:

RX0807

I have been carefully reviewing a District of Columbia hearing committee report issued recently that exonerates four attorneys on charges of conflicts of interest and dishonesty in a case involving the alleged abuse and manipulation of an elderly woman "client."

The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him.  The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations.  In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct.  The hearing committee simply chose to ignore it.

In particular, the hearing committee viciously attacks the complainant (the woman's loving daughter) as biased and incredible.

The reason?

She was angry and upset with the attorneys and was not a lawyer or legal ethics expert herself.  Thus, her entire testimony was ignored due to so-called "bias."
In my opinion, she had every right to be furious with the attorneys who had manipulated and endangered her mother and, based on this execrable report, has every right to regard the self-regulated legal profession as a fraud on the public.

As to the conflict, the hearing committee reasoned that the woman loved her son and wished for "peace in the family."  Thus, there was no need to explore the significant conflicts in the dual representations or deal with the overwhelming evidence of her incompetence and inability to consent to the conflict when she "retained" them.

RX0808

In sum, the report reflects the most superficial reasoning and failure to comprehend fundamental principles of legal ethics that I've seen in nearly 30 years of reading these reports.

When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse.  A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional
> Responsibility panel which decided the attached case
> against Bar Counsel and in favor of the lawyers involved.
> The case spanned several years and the opinion is 219
> pages.  It is the only case known to the Hearing Committee
> that squarely deals with the difference between legal
> competency and legal capacity.  I recommend reading it in
> that it involved charges of Bar Counsel of conflicts of
> interest, dishonesty, fraud and other ethical violations
> against several attorneys alleging that they represented a
> client who Bar Counsel alleged was "incompetent…suffered
> from cognitive impairment…and memory problems."  The
> report cites the relevant cases and other authorities that are
> pertinent and useful to practitioners.

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

      **a.      Ms. Porter referenced, without attribution, Professor Frisch's allegation that the law partner of the Hearing Committee's chairman, John Quinn, wrote the email that Professor Frisch discussed in his October 22, 2012 blog post.**

RX0809

Ms. Porter referenced, without attribution, Professor Frisch's allegation that the law partner of the Hearing Committee's chairman, John Quinn, wrote the email that Professor Frisch discussed in his October 22, 2012 blog post when she stated on page 17 of Disciplinary Counsel's Brief before the Court of Appeals dated January 18, 2018, "The Hearing Committee touted the visibility of this case, to the rest of the bar."

## 2.      Professor Frisch's December 24, 2012 Blog Post.

Professor Frisch's contact with Ms. Porter becomes more likely than not when reading his blog post entitled, "Worst to First" published on December 24, 2012, which stated

> Readers of this blog may recall that I recently severely criticized a District of Columbia hearing committee for absolving four attorneys on charges of elder abuse by failing to deal with the evidence and attacking the complainant and Bar Counsel rather than resolving the case.

> With typical understatement, I called the report the worst in D.C. bar history.

> Bar Counsel has appealed the case to the Board on Professional Responsibility.  Hopefully, justice will eventually prevail.

> ### a.      Notices of Appeal and Briefs filed before the Board on Professional Responsibility are not found on the internet and are only available by viewing the Board's files in person or by receiving them from someone intimately involved in the case – such as Ms. Porter.

The reason that it is more likely than not that Professor Frisch and Ms. Porter were in contact about my case is the fact that Notices of Appeal and Briefs filed before the Board on Professional Responsibility are not found on the internet and are only available by viewing the Board's files in person or by receiving them from someone intimately involved in the case – such as Ms. Porter.

## 3.      Professor Frisch's July 28, 2014 Blog Post.

Professor Frisch published another blog on Monday July 28, 2014 (just three days after the Board on Professional Responsibility posted its order dismissing all charges against my firm on Friday July 25, 2014).  This blog post was entitled "Worst Report Affirmed," and stated, in relevant part:

> In October 2012, I posted a comment about a report of a District of Columbia hearing committee that absolved four lawyers who I believe

RX0810

were proven to have engaged in serious misconduct involving the abuse of an elderly woman suffering from dementia.

The post was titled The Worst Hearing Committee Report in D.C. Bar History.

. . .

Well, two years have passed and the Board on Professional Responsibility affirmed the findings last week.

The majority opinion calls the case one that is resolved by the hearing committee's "credibility" determinations, thereby absolving themselves of the work of actually studying the record and evaluating the wealth of evidence that the hearing committee simply ignored in aid of its steadfast desire to find no misconduct.

. . .

In other words, it's fine to ignore the findings of judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not know that their so-called "client" was incapable of decision-making.

. . .

[T]his is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

### 4.      Professor Frisch's September 17, 2015 Blog Post.

After the Court of Appeals remanded the case to the Board on Professional Responsibility on September 17, 2015, Professor Frisch published a blog post that same day that stated, in relevant part:

The District of Columbia Court of Appeals has remanded the case involving The Worst Hearing Committee Report in D.C. Bar history.

The court sustained the Board of Professional Responsibility's rejection of dishonesty charges and remanded for further consideration of conflict of interest charges.

RX0811

There are several aspects of this action that I find unfortunate in a case that was so poisoned by counterfactual fact findings.

. . .

My review of the record inescapably leads to a contrary conclusion to the findings of a[n] obviously rogue hearing committee.

Second, the court should never remand matters to the BPR when it clearly is on record that it believes no misconduct occurred.

Well, as a judge of the court once said, I have a vote and you (loyal blogger) do not.

. . .

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves.

### 5.    Professor Frisch's May 22, 2017 Blog Post.

Professor Frisch published another blog post on May 22, 2017 entitled "The Most Blatant Regulatory Failure in D.C. Bar History Nears A Conclusion."  This blog post stated, in relevant part:

The seemingly endless saga caused by The Worst Hearing Committee Report in D.C. Bar History continues with a report on remand from the District of Columbia Court of Appeals to its Board on Professional Responsibility that absolves four attorneys from the most horrific case of elder abuse conflicts of interest I have ever seen.

. . .

In other words, it's fine to ignore the findings of multiple judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not know that their so-called "client" was incapable of decision-making.

The majority's logic would absolve an attorney of conversion if the lawyer denied that the money was gone, even if the bank records proved it.

A concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of

RX0812

her son.  Somehow, and for reasons that escape me, those conclusions
did not lead to findings of serious ethical violations.

. . .

Here, in May 2017, the board made true my prediction.  Disciplinary
Counsel can appeal this atrocity to the court, which will face the moral
dilemma of attempting to honor its fact finding standard of review
(deferring to a hearing committee that utterly failed to do its job and a
board unwilling to police it) and the undeniable facts that justify the
severest discipline.  If there ever was a case in D.C. where the disciplinary
system perpetrated a greater injustice and more fully failed in its stated
public protection purpose, it has escaped my attention.  For those of
sufficiently strong stomach, the report in *In re Szymkowicz*, Szymkowicz,
Silverman & King can be accessed through this link [. . .].

### 6.      Professor Frisch's November 8, 2018 Blog Post.

Within a few minutes after the Court of Appeals posted its final opinion in my
firm's case on the Court's website on November 8, 2018, Professor Frisch published a
blog post that was updated several times over the next few days.  The final post was
entitled "District of Columbia Court Absolves Attorneys of Horrific Elder Abuse Conflict."
This blog post states:

The District of Columbia Court of Appeals has in a *per curiam* decision
affirmed the most pro-attorney, anti-public protection recommendation in
the history of the D.C. discipline system.  As a consequence, attorneys
who clearly engaged in a gross conflict of interest get off scot-free for
horrific elder abuse.
A hollow tsk tsk is all the court can muster

In sum, although we fully understand Disciplinary Counsel's
concerns about the Szymkowiczes' conduct in this case, we
accept the Board's conclusion that the Szymkowiczes were
not shown by clear and convincing evidence to have violated
Rule 1.7.

The court majority's "full understanding" offers faint if no hope to future
victims. And does nothing to instruct the Bar and public on the ethics of
elder care abuse.  Rather, the court's discussion of burden shifting has no
practical consequence but to tie the hands of Disciplinary Counsel in
proving conflicts.  There is no case in the history of the D.C. disciplinary
where a hearing committee, the board and the court so studiously ignored
the proven facts to achieve the desired result.

23

RX0813

. . .

The injustice perpetrated in these disgraceful proceedings was a direct result of the court and board's unwarranted deference to the agenda of the hearing committee chair . . .

. . .

During the pendency of these proceedings, I reached out to respected members of the probate bar who uniformly expressed horror at what these lawyers did but were reluctant to speak out in public.  This is - simply put - Exhibit One in anyone's indictment of the "self-regulating" District of Columbia legal profession.

A very disappointing day.

## V.      CONCLUSION.

### A.      Potential Charges Against Ms. Porter.

I believe that the facts support charges that Ms. Porter violated several Rules of the District of Columbia Rules of Professional Conduct, including:

- Rule 3.2 (a), entitled "Expediting Litigation," which states, "In representing a client, a lawyer shall not delay a proceeding when the lawyer knows or when it is obvious that such action would serve solely to harass or maliciously injure another."[5]

- Rule 3.1, entitled "Meritorious Claims and Contentions," which states, in relevant part, "A lawyer shall not bring or defend a proceeding, or assert or controvert an issue therein, unless there is a basis in law and fact for doing so that is not

---

[5]      Comment 1 to Rule 3.2 states, "Dilatory practices bring the administration of justice into disrepute. Delay should not be indulged merely for the convenience of the advocates, or for the purpose of frustrating an opposing party's attempt to obtain rightful redress or repose. It is not a justification that similar conduct is often tolerated by the bench and bar. The question is whether a competent lawyer acting in good-faith would regard the course of action as having some substantial purpose other than delay. Realizing financial or other benefit from otherwise improper delay in litigation is not a legitimate interest of the client."

RX0814

frivolous, which includes a good-faith argument for the extension, modification, or reversal of existing law."[6]

- Rule 3.3 (a), entitled "Candor to Tribunal," which states, in relevant part, "A lawyer shall not knowingly:  (1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the lawyer." . . . (4) Offer evidence that the lawyer knows to be false."[7]

- Rule 3.4 (e), entitled "Fairness to Opposing Party and Counsel," which states, in relevant part, "A lawyer shall not: . . . (e) In trial, allude to any matter that the lawyer does not reasonably believe is relevant or that will not be supported by admissible evidence, assert personal knowledge of facts in issue except when testifying as a witness, or state a personal opinion as to the justness of a cause, the credibility of a witness, the culpability of a civil litigant, or the guilt or innocence of an accused."

- Rule 3.5 (a), entitled "Impartiality and Decorum of the Tribunal," which states, in relevant part, "A lawyer shall not: (a) Seek to influence a judge, juror, prospective juror, or other official by means prohibited by law."

- Rule 3.7 (a), entitled "Lawyer as Witness," which states "A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness except where:  (1) The testimony relates to an uncontested issue; (2) The testimony

---

[6]      Comment 1 to Rule 3.1 states, in relevant part, "The advocate has a duty to use legal procedure for the fullest benefit of the client's cause, but also a duty not to abuse legal procedure.  Comment 2 to Rule 3.1 states, in relevant part, that lawyers "are required to inform themselves about the facts of their clients' cases and the applicable law and determine that they can make good faith arguments in support of their clients' positions."

[7]      Comment 2 to Rule 3.3 states, in relevant part, "An assertion purported to be made by the lawyer, as in an affidavit by the lawyer or in a statement in open court, may properly be made only when the lawyer knows the assertion is true or believes it to be true on the basis of a reasonably diligent inquiry.  There may be circumstances where failure to make a disclosure is the equivalent of an affirmative misrepresentation.  If the lawyer comes to know that a statement of material fact or law that the lawyer previously made to a tribunal is false, the lawyer has a duty to correct the statement."  Comment 3 to Rule 3.3 states, in relevant part, "Legal argument based on a knowingly false representation of law constitutes dishonesty toward the tribunal.  A lawyer is not required to make a disinterested exposition of the law, but must recognize the existence of pertinent legal authorities. . . . The underlying concept is that legal argument is a discussion seeking to determine the legal premises properly applicable to the case."

RX0815

relates to the nature and value of legal services rendered in the case; or (3) Disqualification of the lawyer would work substantial hardship on the client."

- Rule 3.8, entitled "Special Responsibilities of a Prosecutor," which states, in relevant part, "The prosecutor in a criminal case shall not: . . . (b) File in court or maintain a charge that the prosecutor knows is not supported by probable cause; (c) Prosecute to trial a charge that the prosecutor knows is not supported by evidence sufficient to establish a prima facie showing of guilt; (d) Intentionally avoid pursuit of evidence or information because it may damage the prosecution's case or aid the defense; (e) Intentionally fail to disclose to the defense, upon request and at a time when use by the defense is reasonably feasible, any evidence or information that the prosecutor knows or reasonably should know tends to negate the guilt of the accused or to mitigate the offense, or in connection with sentencing, intentionally fail to disclose to the defense upon request any unprivileged mitigating information known to the prosecutor and not reasonably available to the defense, except when the prosecutor is relieved of this responsibility by a protective order of the tribunal; [and] (f) Except for statements which are necessary to inform the public of the nature and extent of the prosecutor's action and which serve a legitimate law enforcement purpose, make extrajudicial comments which serve to heighten condemnation of the accused."[8]

- Rule 8.4, entitled "Misconduct," which states, in relevant part, "It is professional misconduct for a lawyer to: . . . (c) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; [and] (d) Engage in conduct that seriously interferes with the administration of justice."

### B.     Information to Seek in an Investigation of Ms. Porter.

I believe that the following information may be relevant in determining whether Ms. Porter violated any Rules of the District of Columbia Rules of Professional Conduct during her prosecution of my case:

- Information concerning the November 2005 meeting between Mrs. Ackerman, on the one hand, and Ms. Porter and her investigator, on the other hand.

- All communications between the Office of Disciplinary Counsel and Mary Frances Abbott

---

[8]     Comment 1 to Rule 3.8 states, in relevant part, "A prosecutor has the responsibility of a minister of justice and not simply that of an advocate.  This responsibility carries with it specific obligations to see that the defendant is accorded procedural justice and that guilt is decided upon the basis of sufficient evidence."

RX0816

- All communications between the Office of Disciplinary Counsel and Mrs. Ackerman's first attorney, Herbert Callihan.

- All communications between the Office of Disciplinary Counsel and Mrs. Ackerman's court-appointed attorney, Kenneth Loewinger.

- All communications between the Office of Disciplinary Counsel and Mary Frances Abbott's attorney, George Huckabay.

- All communications Ms. Porter and Professor Frisch concerning my case.

**C.    Conclusion.**

Thank you for taking the time to review the contents of this letter and I look forward to speaking with your investigators and responding to any request for additional information.

Respectfully submitted,

J.P. Szymkowicz

RX0817

# APPENDIX

# PROFESSOR FRISCH'S BLOG POSTS

RX0818

**Professor Frisch's Blog Post
"The Worst Hearing Committee Report
in D.C. Bar History"
October 22, 2012**

RX0819

Legal Profession Blog

Monday, October 22, 2012

# The Worst Hearing Committee Report In D.C. Bar History

By Legal Profession Prof

I have been carefully reviewing a District of Columbia hearing committee report issued recently that exonerates four attorneys on charges of conflicts of interest and dishonesty in a case involving the alleged abuse and manipulation of an elderly woman "client."

The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

In particular, the hearing committee viciously attacks the complainant (the woman's loving daughter) as biased and incredible.

The reason?

She was angry and upset with the attorneys and was not a lawyer or legal ethics expert herself. Thus, her entire testimony was ignored due to so-called "bias."

In my opinion, she had every right to be furious with the attorneys who had manipulated and endangered her mother and, based on this execrable report, has every right to regard the self-regulated legal profession as a fraud on the public.

As to the conflict, the hearing committee reasoned that the woman loved her son and wished for "peace in the family." Thus, there was no need to explore the significant conflicts in the dual representations or deal with the overwhelming evidence of her incompetence and inability to consent to the conflict when she "retained" them.

In sum, the report reflects the most superficial reasoning and failure to comprehend fundamental principles of legal ethics that I've seen in nearly 30 years of reading these reports.

When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse. A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved.The case spanned several years and the opinion is 219 pages. It is the only case known to the Hearing Committee that squarely deals with the difference between legal competency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent…suffered from cognitive impairment..and memory problems."  The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.

> https://www.dropbox.com/s/iyu7z002yfm1q5r/Ackerman__Hearing_Committee's_Final_Decision_Order_dated_September_28_2012.pdf

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

 It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

RX0820

The title to this post reflects my opinion. It calls to mind one of my favorite Seinfeld lines from Elaine to Jerry: "Just when I think you are the shallowest man I've ever met, you manage to drain a little more out of the pool."

Just when I think these reports can't possibly get any worse, one like this one shows up. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2012/10/the-worst-hearing-committee-report-in-dc-bar-history.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0821

# Professor Frisch's Blog Post
# "Worst to First"
# December 24, 2012

RX0822

# Legal Profession Blog

## A Member of the Law Professor Blogs Network

### Blog Editors

**S. Alan Childress**
Conrad Meyer III Professor of Law
Tulane Univ. Law School
• achildr[at]tulane.edu
• Website

**Michael S. Frisch**
Ethics Counsel
Georgetown Law Center
• frischm[at]law.georgetown.edu
• Profile

**Jeffrey M. Lipshaw**
Associate Professor of Law
Suffolk Law School
• jlipshaw[at]suffolk.edu
• Profile
• SSRN Author Page

### Contributing Editor

**Nancy B. Rapoport**
Gordon Silver Professor of Law
William S. Boyd School of Law, UNLV
• nancy.rapoport[at]unlv.edu
• Profile
• SSRN Author Page

### News Readers & Feeds

FeedBurner Subscription Service



Enter your Email

[                    ]

[ Subscribe me! ]

Powered by FeedBlitz

*View Recent Posts from Network Blog Feeds*

### Search This Blog

[            ] [ Search ]

« The Trouble With Tribble | Main | No Higher Power »

December 24, 2012

## Worst To First

Readers of this blog may recall that I recently severely criticized a District of Columbia hearing committee for absolving four attorneys on charges of elder abuse by failing to deal with the evidence and attacking the complainant and Bar Counsel rather than resolving the case.

With typical understatement, I called the report **the worst in D.C. bar history.**

Bar Counsel has appealed the case to the Board on Professional Responsibility. Hopefully, justice will eventually prevail.

Well, I have just read another hearing committee report that is the exact opposite -- a thoroughly professional, 201 page analysis of the charges in two matters with a well-reasoned and appropriate recommendation of disbarment.

The main charges involve the attorney's representation of a plaintiff in a sex harassment case.

When the client became concerned about the attorney's behavior (in particular, his disrespect for a Superior Court judge), she discharged him.

He retaliated with a campaign to destroy her with court process that must be read to be believed. He instituted frivolous litigation, breached confidentiality, made false statements and created false evidence. As the client testified, the attorney 's conduct turned her life upside down.

The hearing committee's report may be found at this **link** by inserting the attorney's name --Ellis S. Frison.

Comment from Stephen Williams:

    The Court of Appeals is exclusively charged with regulating the practice of law in the District of



Wolters Kluwer
Law & Business

Best Friend at the Bar
The New Balance for Today's Woman Lawyer

Best Friends at the Bar
The *New Balance* for Today's Woman Lawyer

Blakely

Susan Smith Blakely

Learn More: WoltersKluwerLB.com
Contact Us: 1.800.950.5259

### Archives

#### Recent Posts

From Insider Trader To Inside Prison

Bill Henderson is the 2d Most Influential Person in Legal Education - National Jurist Magazine

South Of The Border

Stand By Me

Letters from Jail

The Wrong Way

An Unscheduled Landing Leads To A Legal Malpractice Claim

Attorney Not Crucified For Unprofessional Remark

Illinois Battle Over Breach of Fiduciary Duty Charges

An Inappropriate Colloquy Gets A Judge Admonished

## Resources

Columbia. Short of Congress removing this authority from the Court, the Court is the only entity that is able to fix this problem. And yet, you repeatedly refuse to lay these shortcomings at the feet of the Court which is where it really belongs.

Stephen

UPDATE: I respectfully disagree with the above comment. My article No Stone Left Unturned is premised on the proposition that the D.C. Court of appeals made a fundamental error in creating and deferring to a board dominated by volunteer lawyers.

When the court issues an opinion that I disagree with, I say so --here's **an example.** (Mike Frisch)

**December 24, 2012** in Bar Discipline & Process | Permalink

## TrackBack

TrackBack URL for this entry:
http://www.typepad.com/services/trackback/6a00d8341bf

Listed below are links to weblogs that reference
**Worst To First:**

## Comments

## Post a comment

## Verify your Comment

## Previewing your Comment

Posted by:  |

This is only a preview. Your comment has not yet been posted.

[Post]  [Edit]  ⟳

Your comment could not be posted. Error type:
Your comment has been saved. Comments are moderated and will not appear until approved by the author. **Post another comment**

The letters and numbers you entered did not match the image. Please try again.

As a final step before posting your comment, enter the letters and numbers you see in the image below. This prevents automated programs from posting comments.

### About Legal Profession Blog
• Comments & Content to:
jlipshaw[at]suffolk.edu

### Find Legal Profession Profs
• Google Scholar
• Law Schools
• SSRN

### Ethics
• ABA Center for Professional Responsibility
• ABA Ethics Search
• ABA Links to State Ethics and Professional Responsibility Sites
• ABA Model Rules of Professional Conduct
• American Legal Ethics Library, Cornell Law School
• Louis Stein Center for Law and Ethics (Fordham Law School)
• Miller-Becker Center for Professional Responsibility (Akron Law)
• SSRN: Legal Ethics and Professional Responsibility
• The Georgetown Journal of Legal Ethics

### Bar Admission and Discipline
• NOBC, National Organization of Bar Counsel
• APRL, The Association of Professional Responsibility Lawyers
• National Conference of Bar Examiners
• Halt

### Firm Management
• Centre for Professional Service Firm Management, Univ. of Alberta
• Clifford Chance Centre for the Management of Professional Service Firms, Univ.of Oxford

### The Profession
• Harvard Law School Program on the Legal Profession
• Law.com
• Mondaq

### Topical Archive

Abstracts Highlights - Academic Articles on the Legal Profession

Associates

Bar Discipline & Process

Billable Hours

Blogging

Books

Childress

CLE

Clients

Comparative Professions

Conferences & Symposia

Current Affairs

Economics

Ethics

Film

Food and Drink

Frisch

Games

General Counsel

Guest Bloggers from the Academy

Highlights from bepress and Law & Society Review

Hiring

Hot Topics

In-House

Interviewing

Judicial Ethics and the Courts

Law & Business

Law & Society

Law Firms

Lawyers & Popular Culture

Lipshaw

• National Law Journal
• SSRN: Law & Society: The Legal Profession

**Other Blogs**
• LawBizBlog
• Legal Ethics Forum
• My Shingle
• Robert Ambrogi's LawSites

**Free Legal Web Sites**
• Findlaw
• JURIST

**Recent Comments**

Ashley Casas on Stand By Me

Stephen Williams on Illinois Battle Over Breach of Fiduciary Duty Charges

Stephen Williams on The Worst Hearing Committee Report In D.C. Bar History

Lavelle Coleman on Buying Into License Revocation

Stephen Williams on With God As My Witness

Steve on Till Death Do Us Disinherit

Robert Gould on Loyalty Trumps Mobility In New Mexico Decision

Rick Underwood on What I Did For Love

Rick Underwood on What I Did For Love

Peter Gulia on What I Did For Love

**Blog Traffic**

sitemeter
883,159
Since September 18, 2006

**Blogware**

Powered by TypePad

**Notices**

Having trouble reading this image? **View an alternate.**

[ Continue ]

Name:
[_____]

Email Address:
[_____]

URL:
[_____]

Comments:
[                              ]
[                              ]
[                              ]
[                              ]
[                              ]

[ Preview ]   [ Post ]

☐ Remember personal info?

Monday Calendar of Programs and Events

Partners

Privilege

Pro Bono

Professional Responsibility

Rapoport

Religion

Science

Straddling the Fence

Teaching & Curriculum

Television

The Practice

Travel

Web/Tech

Weblogs

Weekly Top Ten: SSRN Legal Ethics & Professional Responsibility

The Archives

**Weekly Archives**

December 30, 2012 - January 5, 2013

December 23, 2012 - December 29, 2012

December 16, 2012 - December 22, 2012

December 9, 2012 - December 15, 2012

December 2, 2012 - December 8, 2012

November 25, 2012 - December 1, 2012

November 18, 2012 - November 24, 2012

November 11, 2012 - November 17, 2012

© Copyright All Rights Reserved
Contact post author for permissions

November 4, 2012 - November 10, 2012

October 28, 2012 - November 3, 2012

More...

RX0826

# Professor Frisch's Blog Post
# "Worst Report Affirmed"
# July 28, 2014

RX0827

Legal Profession Blog

7/29/14, 11:23 AM

Legal Profession Blog

# A Member of the Law Professor Blogs Network

Sponsored by Wolters Kluwer

Monday, July 28, 2014

### Worst Report Affirmed

By Legal Profession Prof

In October 2012, I posted a comment about a report of a District of Columbia hearing committee that absolved four lawyers who I believe were proven to have engaged in serious misconduct involving the abuse of an elderly woman suffering from dementia.

The post was titled The Worst Hearing Committee Report in D.C. Bar History.

My take

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

Well, two years have passed and the Board on Professional Responsibility affirmed the findings last week.

The majority opinion calls the case one that is resolved by the hearing committee's "credibility" determinations, thereby absolving themselves of the work of actually studying the record and evaluating the wealth of evidence that the hearing committee simply ignored in aid of its steadfast desire to find no misconduct.

From the BPR majority opinion

> We adopt the Hearing Committee's findings of fact because we agree that they are supported by substantial evidence. Despite the quantity of evidence urged by Bar Counsel, when we account for the Hearing Committee's qualitative credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents. The facts argued by Bar Counsel certainly do not "produce … a firm belief or conviction" that the Hearing Committee got it wrong.

In other words, it's fine to ignore the findings of judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not *know* that their so-called "client" was incapable of decision-making.

The concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of her son. Somehow, those conclusions did not lead to findings of serious ethical violations.

The concurrence concludes

> This is a sad case. It involves an unnecessary and bitter dispute between a brother and sister, neither of whom distinguished him or herself, over the financial affairs of their mother. Mrs. Ackerman was visually impaired, suffered from dementia, and was distressed by the dispute between her children. The dispute resulted in extensive litigation that was funded by the trust established to provide for Mrs. Ackerman in her later years. The costs of that litigation contributed to the depletion of the trust assets such that questions were raised as to the sufficiency of the trust to support Mrs. Ackerman.

> It is also a difficult case. Attorneys retained to handle matters in situations such as this face difficult decisions concerning the capacity of elderly clients to make informed and educated decisions. As noted, the Rules of Professional Conduct provide little guidance for when a lawyer must decline the representation, or withdraw from the representation of a client, who is suffering from dementia and other disabilities that impair her ability to function. That is particularly true in situations such as this where the client retains social graces, has an outward appearance of understanding, at some level, of what is happening, and where, as here, the client is relatively clear as to her wishes, even if she does not fully appreciate the consequences of her actions.

I agree that this is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

RX0828

The disingenuous suggestion of the concurrence that the lawyers acted in a good-faith belief as to the mother's competence is belied by an overwhelming amount of record evidence.

And the false equivalence between brother and sister --the brother who tried (with the help of four lawyers) to loot his mother's estate and the sister who tried to protect her -- is deeply offensive to anyone who bothered to study the record of this sorry affair.

It's as if the BPR would find that the person who defends frivolous litigation is as blameworthy as the person who initiates it.

I expect Bar Counsel to appeal these dismissals to the Court of Appeals.

Regardless of the eventual outcome (and I have no optimism at this point) , the story of this case is Exhibit One to prove the failure of the volunteer disciplinary system in the District of Columbia.

In particular, this outcome serves as a warning to victims --don't bother to bring your concerns to the D.C.Bar, as you will only get attacked for your trouble.

To be fair, the hearing committee's gross and inexcusable failure to deal with the evidence put the BPR in a difficult position. One approach would have been to apply due diligence to study and learn the record; the other is the approach taken here --blow the whole thing off as a credibility contest and simply fail to deal with the evidence in a meaningful way.

These so-called guardians of the public trust should be thoroughly ashamed of themselves. In a just world, what happened to Fran Abbott (the complaining daughter) would happen to them.

The BPR report can be found at this link under the names Szykmowicz, Szymkowicz, Silverman and King. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2014/07/worst-report-affirmed.html

© Copyright 2004-2013 by Law Professor Blogs, LLC. All rights reserved.

RX0829

**Professor Frisch's Blog Post
"Worst Report Remanded"
September 17, 2015**

RX0830

Legal Profession Blog

Thursday, September 17, 2015

# Worst Report Remanded

By Legal Profession Prof

The District of Columbia Court of Appeals has remanded the case involving The Worst Hearing Committee Report in D.C. Bar history.

The court sustained the Board of Professional Responsibility's rejection of dishonesty charges and remanded for further consideration of conflict of interest charges.

There are several aspects of this action that I find unfortunate in a case that was so poisoned by counter-factual fact findings.

First, the court accepts the hearing committee's findings that the elderly victim of the gross misconduct was legally competent.

> We take as a given for these purposes the Board's conclusions that Ms. Ackerman had the legal capacity to make the decisions at issue; wanted to transfer her assets to Dr. Ackerman's control; wanted to provide for Dr. Ackerman, even to her financial detriment; did not want the trust to continue; did not want Mr. Abbott to continue as trustee; was willing to pursue litigation to achieve these objectives; and was aware of the risks and costs of litigation. Nevertheless, there was evidence (largely if not entirely undisputed) of numerous other circumstances indicating a risk of conflicting interests requiring informed consent to joint representation.

My review of the record inescapably leads to a contrary conclusion to the findings of a obviously rogue hearing committee.

Second, the court should never remand matters to the BPR when it clearly is on record that it believes no misconduct occurred.

Well, as a judge of the court once said, I have a vote and you (loyal blogger) do not.

The remand requires an exploration of informed consent

> In the circumstances of this case, we conclude that the Szymkowiczes could not properly represent both Ms. Ackerman and Dr. Ackerman without obtaining informed consent to the joint representation. Because it concluded that informed consent was not required, the Board did not decide whether informed consent was obtained. The Hearing Committee did conclude that Mr. J.T. Szymkowicz obtained Ms. Ackerman's informed consent. Nevertheless, "[r]ather than deciding [that] issue without the benefit of the Board's judgment, we leave [the issue] for the Board to consider on remand . . . ." In re Hopkins, 677 A.2d 55, 63 n.17 (D.C. 1996).  We do, however, note several issues that may merit the Board's consideration: (1) whether, as Bar Counsel contends, respondents bear the burden of establishing that they obtained informed consent or whether instead Bar Counsel bears the burden in disciplinary proceedings of establishing the absence of informed consent; (2) whether, as the Hearing Committee appears to have assumed, the determination whether Ms. Ackerman gave informed consent

should be made under the standard applicable to the determination whether a party had capacity to engage in a transaction; (3) whether Rule 1.7 (b)(2) is violated whenever the requisite informed consent is not in fact obtained, or whether instead it is a defense under the Rule that the attorney reasonably but mistakenly believed that informed consent had been obtained; (4) the implications of Rule 1.14, which addresses the obligations of a lawyer representing a client with diminished capacity, a topic we discuss infra with respect to the conflict-of-interest charges against Ms. Silverman and Mr. King; and (5) the date on which the Szymkowiczes ended their representation of Ms. Ackerman.

The court concludes that "Ms. Ackerman's mental capacity was indisputably diminished to a degree" and asks that the implications of Rule 1.14 be addressed on remand.

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2015/09/the-district-of-columbia-court-of-appeals-has-remanded-the-case-involving-the-worst-hearing-committee-report-in-dc-bar-hist.html

© Copyright 2004-2015 by Law Professor Blogs, LLC. All rights reserved.

RX0832

**Professor Frisch's Blog Post
"The Most Blatant Regulatory Failure in D.C. Bar
History Nears a Conclusion"
May 22, 2017**

RX0833

Legal Profession Blog

Monday, May 22, 2017

# The Most Blatant Regulatory Failure In D.C. Bar History Nears A Conclusion

By Legal Profession Prof

The seemingly endless saga caused by The Worst Hearing Committee Report In D.C. Bar History continues with a report on remand from the District of Columbia Court of Appeals to its Board on Professional Responsibility that absolves four attorneys from the most horrific case of elder abuse conflicts of interest I have ever seen.

From my summary of the hearing committee report

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

The hearing committee report was filed in October 2012.

Nearly two years later, the board filed its first report as we reported

> From the BPR majority opinion

>> We adopt the Hearing Committee's findings of fact because we agree that they are supported by substantial evidence. Despite the quantity of evidence urged by Bar Counsel, when we account for the Hearing Committee's qualitative credibility determinations, we agree that Bar Counsel has not clearly and convincingly proved the charges against Respondents. The facts argued by Bar Counsel certainly do not "produce … a firm belief or conviction" that the Hearing Committee got it wrong.

In other words, it's fine to ignore the findings of multiple judges and the observations of a dozen witnesses if you accept the self-serving statements of the attorneys that they did not *know* that their so-called "client" was incapable of decision-making.

The majority's logic would absolve an attorney of conversion if the lawyer denied that the money was gone, even if the bank records proved it.

A concurring opinion would find that the attorneys were aware that their "client" was incapacitated and that her interests conflicted with those of her son. Somehow, and for reasons  that escape me,  those conclusions did not lead to findings of serious ethical violations.

We noted the concurring board opinion and expressed some views about it

The concurrence concludes

> This is a sad case. It involves an unnecessary and bitter dispute between a brother and sister, neither of whom distinguished him or herself, over the financial affairs of their mother. Mrs. Ackerman was visually impaired, suffered from dementia, and was distressed by the dispute between her children. The dispute resulted in extensive litigation that was funded by the trust established to provide for Mrs. Ackerman in her later years. The costs of that litigation contributed to the depletion of the trust assets such that questions were raised as to the sufficiency of the trust to support Mrs. Ackerman.

> It is also a difficult case. Attorneys retained to handle matters in situations such as this face difficult decisions concerning the capacity of elderly clients to make informed and educated decisions. As noted, the Rules of Professional Conduct provide little guidance for when a lawyer must decline the representation, or withdraw from the representation of a client, who is suffering from dementia and other disabilities that impair her ability to function. That is particularly true in situations such as this where the client retains social graces, has an outward appearance of understanding, at some level, of what is happening, and where, as here, the client is relatively clear as to her wishes, even if she does not fully appreciate the consequences of her actions.

I agree that this is a "sad case," but not for the reasons set forth. The case sadly reflects the inability of the BPR to deal meaningfully with a case in which the hearing committee entirely failed to do its job.

The disingenuous suggestion of the concurrence that the lawyers acted in a good-faith belief as to the mother's competence is belied by an overwhelming amount of record evidence.

And the false equivalence between brother and sister --the brother who tried (with the help of four lawyers) to loot his mother's estate and the sister who tried to protect her -- is deeply offensive to anyone who bothered to study the record of this sorry affair.

It's as if the BPR would find that the person who defends frivolous litigation is as blameworthy as the person who initiates it.

I expect Bar Counsel to appeal these dismissals to the Court of Appeals.

Regardless of the eventual outcome (and I have no optimism at this point) , the story of this case is Exhibit One to prove the failure of the volunteer disciplinary system in the District of Columbia.

In particular, this outcome serves as a warning to victims --don't bother to bring your concerns to the D.C.Bar, as you will only get attacked for your trouble.

To be fair, the hearing committee's gross and inexcusable failure to deal with the evidence put the BPR in a difficult position. One approach would have been to apply due diligence to study and learn the record; the other is the approach taken here --blow the whole thing off as a credibility contest and

simply fail to deal with the evidence in a meaningful way.

These so-called guardians of the public trust should be thoroughly ashamed of themselves. In a just world, what happened to Fran Abbott (the complaining daughter) would happen to them.

The court remanded the case back to the board in September 2015.

I said at the time

I view this result as somewhat better than a Get Out of Jail Free Card but have little hope that the board will treat the matter with the seriousness it richly deserves.

Here, in May 2017, the board made true my prediction.

Disciplinary Counsel can appeal this atrocity to the court, which will face the moral dilemma of attempting to honor its fact finding standard of review (deferring to a hearing committee that utterly failed to do its job and a board unwilling to police it) and the undeniable facts that justify the severest discipline.

If there ever was a case in D.C. where the disciplinary system perpetrated a greater injustice and more fully failed in its stated public protection purpose, it has escaped my attention.

For those of sufficiently strong stomach, the report in In re Szymkovicz, Szymkovicz, Silverman & King can be accessed through this link. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2017/05/the-seemingly-endless-saga-caused-by-the-worst-hearing-committee-report-in-dc-bar-history.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0836

**Professor Frisch's Blog Post
"D.C. Disciplinary Counsel Has New Leadership"
August 17, 2018**

RX0837

Legal Profession Blog

Friday, August 17, 2018

# D.C. Disciplinary Counsel Has New Leadership

By Legal Profession Prof

The District of Columbia Office of Disciplinary Counsel has its top positions in place with the elevation of Julia Porter to Deputy Disciplinary Counsel.

With Phil Fox and Ms. Porter at the helm, the office is blessed with effective leadership for the first time in decades.

Thus one will likely see fewer of the cases that take eight or more years to investigate and a decade or more to go from soup to nuts.

A case docketed for investigation in 2010 has resulted in a hearing committee report proposing a 30-day suspension with fitness and the usual "no harm, no foul" approach to the delay.

> Respondent also asserts that Disciplinary Counsel's delays during the investigation should be considered in mitigating sanction. Delay may be considered a mitigating factor in determining an appropriate sanction. In re Williams, 513 A.2d 793, 798 (D.C. 1986) (per curiam). But, the Court has clarified that the circumstances must be "sufficiently unique and compelling to justify lessening what would otherwise be the sanction necessary to protect the public interest." In re Fowler, 642 A.2d 1327, 1331 (D.C. 1994). Delays that are necessary to the decision-making process or the result of a respondent's own actions or inaction do not qualify. Id.

The wrong approach of the accused attorney did not help him

> the Hearing Committee has concluded that, at times, Respondent was evasive and was non-responsive to questions posed by the Hearing Committee members concerning his conduct. Respondent avoided responding to questions that might elicit acknowledgment of his wrongful conduct.

As to fitness

> Here, Respondent admitted during the disciplinary hearing that he purposefully left earned fees in his IOLTA (FF 41-43, 47), that he lacked an accounting system to track funds despite having a total of six bank accounts for his various business entities (FF 15, 41; DX 2 at Bates 7), and that he had failed to exercise supervision over his non-lawyer employees' access to his signature stamp for the IOLTA (FF 38). Respondent failed to acknowledge the wrongfulness of this misconduct, and his testimony reflected his failure to appreciate his fiduciary responsibilities for the clients' entrusted funds. Thus, Respondent's conduct during the disciplinary hearing raises a serious doubt that he will act ethically and competently in the future when handling entrusted funds. The Hearing Committee recommends that Respondent be suspended from the practice of law for 30 standards, and (2) he has taken a continuing legal education class on law practice days. As part of his proof establishing his fitness, Respondent should show that (1) he has sufficient accounting mechanisms in place to comply with Bar Rules and fiduciary management and accounting.

RX0838

The case is In re Luis Salgado and can be found here.

Disclosure: Deputy Porter and I were colleagues  at Bar Counsel for a decade, regularly co-counseled cases (see, e.g.  here, here and  here)  and have co-taught ethics courses at Georgetown Law for many years.

I am biased in her favor. (Mike Frisch)

http://lawprofessors.typepad.com/legal_profession/2018/08/the-district-of-columbia-office-of-disciplinary-counsel-has-its-top-positions-in-place-with-the-elevation-of-julia-porter-to.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0839

**Professor Frisch's Blog Post
"District of Columbia Court Absolves Attorneys
of Horrific Elder Abuse Conflict"
November 8, 2018**

**ORIGINAL POST**

RX0840

Legal Profession Blog

Thursday, November 8, 2018

## DIstrict Of Columbia Court Absolves Attorneys Of Horrific Elder Abuse Conflict

By Legal Profession Prof

The District of Columbia Court of Appeals has essentially affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system .

As a consequence,  attorney s who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.

There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result.

A lone voice of integrity can be found in the dissent of Senior Judge John Steadman.

From my earlier post on this case

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

I will have much more to say. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2018/11/district-of-columbia-court-absolves-elder-abuse-conflict.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.

RX0841

**Professor Frisch's Blog Post
"District of Columbia Court Absolves Attorneys
of Horrific Elder Abuse Conflict"
November 8, 2018**

**UPDATED POST**

RX0842

Legal Profession Blog

Thursday, November 8, 2018

## District Of Columbia Court Absolves Attorneys Of Horrific Elder Abuse Conflict

By Legal Profession Prof

The District of Columbia Court of Appeals has in a per curiam decision  affirmed the most pro-attorney, anti-public protection recommendation in the history of the D.C. discipline system .

As a consequence,  attorneys who clearly engaged in a gross conflict of interest get off scot-free for horrific elder abuse.

A hollow tsk tsk is all the court can muster

> In sum, although we fully understand Disciplinary Counsel's concerns about the Szymkowiczes' conduct in this case, we accept the Board's conclusion that the Szymkowiczes were not shown by clear and convincing evidence to have violated Rule 1.7.

The court majority's "full understanding" offers faint if no hope to future victims. And does nothing to instruct the Bar and public on the ethics of elder care abuse.

Rather, the court's discussion of burden shifting has no practical consequence but to tie the hands of Disciplinary Counsel in proving conflicts.

There is no case in the history of the D.C. disciplinary where a hearing committee, the board and the court so studiously ignored the proven facts to achieve the desired result

The lone voice of concern can be found in the dissent of Senior Judge John Steadman

> I disagree that the structure of criminal law presents a fair analogy. Bar discipline proceedings are designed to ensure that attorneys abide by the rules of professional conduct that their license demands and to protect the public accordingly.

Not today.

From my earlier post on this case

> The evidence in the case supports a conclusion that the attorneys, in the course of representing the woman's son, purported to represent her as well and caused her to execute a series of documents giving control or complete ownership of her property to him. The result was the significant depletion of the woman's financial resources (and she paid for the ensuing litigation brought in her name), the withdrawal of two of the attorneys after a judge had raised the conflict issue and a court determination by one of the most respected jurists in the District of Columbia that the woman had not been competent to sign the documents that the attorneys had drafted for the benefit of the son.

> After they withdrew, the two attorneys continued to stage-manage the dual representation by hiring and paying successor counsel (with the woman's money) and drafting legal documents for the woman's signature.

> The hearing committee, throughout its report, repeatedly states that there was "no evidence" of any ethical violations. In fact, there was the testimony of twelve witnesses called by Bar Counsel and the orders of Superior Court judges that provided compelling evidence of the charged misconduct. The hearing committee simply chose to ignore it.

The injustice perpetrated in these disgraceful proceedings was a direct result of the court and board's unwarranted deference to the agenda of the hearing committee chair as I blogged

> When I read the report, I wondered about the background of the committee chair and surprise, surprise: He's an elder care lawyer. He signed (and presumably authored) an opinion that makes it nearly impossible to prosecute lawyer elder abuse. A classic "fox guards henhouse" approach to bar discipline.

And then, this from the committee chair's law partner hits my in box:

> My partner, John Quinn, chaired a Board on Professional Responsibility panel which decided the attached case against Bar Counsel and in favor of the lawyers involved.The case spanned several years and the opinion is 219 pages. It is the only case known to the Hearing Committee that squarely deals with the difference between legal compentency and legal capacity.  I recommend reading it in that it involved charges of Bar Counsel of conflicts of interest, dishonesty, fraud and other ethical

violations against several attorneys alleging that they represented a client who Bar Counsel alleged was "incompetent…suffered from cognitive impairment..and memory problems."  The report cites the relevant cases and other authorities that are pertinent and useful to practitioners.

https://www.dropbox.com/s/iyu7z002yfm1q5r/Ackerman__Hearing_Committee's_Final_Decision_Order_dated_September_28_2012.pdf

I find this shocking, but at least it makes the agenda of this report crystal clear: protect the profession, trash the victim of misconduct (and discourage other victims from coming forward), make future Bar Counsel prosecutions virtually impossible and use the whole thing as a marketing tool.

 It also is noteworthy that it took the hearing committee over 2 1/2 years to produce this whitewash, notwithstanding a rule that requires that the report be filed within 120 days of the close of the hearing.

In its wisdom, the board refused to consider the above email. Ignoring it was more convenient.

During the pendency of these proceedings, I reached out to respected members of the probate bar who uniformly expressed horror at what these lawyers did but were reluctant to speak out in public.

This is - simply put - Exhibit One in anyone's indictment of the "self-regulating" District of Columbia legal profession.

A very disappointing day. (Mike Frisch)

https://lawprofessors.typepad.com/legal_profession/2018/11/district-of-columbia-court-absolves-elder-abuse-conflict.html

© Copyright 2004-2018 by Law Professor Blogs, LLC. All rights reserved. Copyright Policy.



# BOARD ON PROFESSIONAL RESPONSIBILITY

May 28, 2019

Robert C. Bernius
*Chair*

Matthew G. Kaiser
*Vice Chair*

Mary Lou Soller
Billie LaVerne Smith
David Bernstein
Lucy Pittman
Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
*Board Members*

James T. Phalen
*Executive Attorney*

J.P. Szymkowicz, Esquire
Szymkowicz & Szymkowicz, LLP
P.O. Box 57333
Washington, D.C. 20037-0333

      Re:      Porter Complaint

Dear Mr. Szymkowicz:

    I have reviewed your May 9, 2019 complaint against Deputy Disciplinary Counsel Julia L. Porter, in which you (i) allege that she made false statements in Disciplinary Counsel's Opposition to your request for expungement of your disciplinary records, and (ii) request that these additional allegations be considered as part of the Board's administrative review of your March 29, 2019 complaint.

    It is not appropriate for the Board to conduct an administrative review of statements made in briefs filed in a currently-pending matter. To conclude otherwise would invite any respondent who disagrees with Disciplinary Counsel's argument in any brief filed in any pending matter to ask the Board separately to investigate Disciplinary Counsel's arguments. This does not mean that Disciplinary Counsel is permitted to make false statements in any matter, only that the Board will not review such allegations while the underlying matter is still pending.

If, following the resolution of your request to expunge your disciplinary records, you continue to believe that Ms. Porter made false statements, you may seek an administrative review at that time.

Sincerely,

Robert C. Bernius,
Chair

cc:   Hon. Anna Blackburne-Rigsby, Chief Judge
      Hamilton P. Fox, III, Esquire
      James T. Phalen, Esquire

2

RX0846



## BOARD ON PROFESSIONAL RESPONSIBILITY

April 15, 2019

J.P. Szymkowicz, Esquire
Szymkowicz & Szymkowicz, LLP
P.O. Box 57333
Washington, D.C. 20037-0333

Robert C. Bernius
*Chair*

Matthew G. Kaiser
*Vice Chair*

Mary Lou Soller
Billie LaVerne Smith
David Bernstein
Lucy Pittman
Elissa J. Preheim
Sundeep Hora
Bernadette C. Sargeant
*Board Members*

James T. Phalen
*Executive Attorney*

Re:     Porter Complaint

Dear Mr. Szymkowicz:

I have reviewed your complaint against Deputy Disciplinary
Counsel Julia L. Porter, including your request that the Board's Executive
Attorney be appointed as Special Disciplinary Counsel to investigate Ms.
Porter's conduct during the investigation and prosecution of Bar Docket
Nos. 2005-D179 (John T. Szymkowicz) & 2007-D050 (John P.
Szymkowicz).  Please note that D.C. Bar R. XI, § 19(a) provides that
Disciplinary Counsel and all assistants and employees are immune from
disciplinary complaint.  The rule states, in pertinent part:

Members of the Board, its employees, members of
Hearing Committees, Disciplinary Counsel, and all assistants
and employees of Disciplinary Counsel, all persons engaged in
counseling, evaluating or monitoring other attorneys pursuant
to a Board or Court order or a diversion agreement, and all
assistants or employees of persons engaged in such counseling,
evaluating or monitoring shall be immune from disciplinary
complaint under this rule and from civil suit for any conduct in
the course of their official duties.

*See In re Nace*, 490 A.2d 1120, 1124 (D.C. 1985) (recognizing that
Disciplinary Counsel has immunity from disciplinary complaints arising
from activities within the scope of his or her duties).

Because your complaint involves alleged misconduct occurring in
the course of Deputy Disciplinary Counsel Porter's official duties, she is
immune from disciplinary complaint.  I am therefore precluded under

D.C. Bar Rule XI, § 19(a) from referring your allegations for investigation.

The Board, however, may conduct an administrative review of allegations of misconduct against members of the Office of Disciplinary Counsel.   We will undertake such a review in this case.

Sincerely,

Robert C. Bernius,
Chair

cc:   Hon. Anna Blackburne-Rigsby, Chief Judge
Hamilton P. Fox, III, Esquire
James T. Phalen, Esquire

2

RX0848